REVISED, April 6, 1998

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 96-10997**

---

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**VERSUS**

**MARTHA WEST GREER,**

**Defendant-Appellant.**

---

Appeal from the United States District Court
For the Northern District of Texas

---

March 11, 1998

Before GARWOOD, DUHE', and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

Martha West Greer ("Greer"), appeals her criminal conviction for embezzling funds from the United States Postal Service ("Postal Service") in violation of 18 U.S.C. § 1711. Greer contends (1) that there is insufficient evidence to support her conviction, (2) that her indictment was wrongfully obtained with perjured testimony, and (3) that the district court erroneously entered an order of restitution. We affirm.

## I.  BACKGROUND

Greer worked for the Postal Service as the head window teller at the Berry Street station from October 1993 to August 1994.[1]  As head window teller, Greer was responsible for the contents of her window drawer, as well as the contents of a safe located at the station.  Her window drawer, referred to in postal parlance as a "flexible credit account," housed cash, stamps, and money orders used to conduct day-to-day business at her walk-up window.  The safe, referred to as the "unit reserve," stored stamps and money orders used to replenish the tellers' drawers.  Greer, who established the combination to the unit reserve safe soon after becoming head window teller, was the only person with access to the safe's contents.

On a typical day, Greer worked at her walk-up window and assisted the other tellers, sometimes replenishing their drawers with stamp stock from the unit reserve.  At the end of each day, Greer collected the other tellers' drawers and calculated the station's overall balance.  These duties sometimes kept Greer at the station until 7:30 p.m.  Before departing for the night, Greer was responsible for locking the unit reserve safe and the station itself.  This entailed activating the Berry Street station's security system, which utilized a motion detector for the area

---

[1]  Greer had worked for the Postal Service for more than ten years.  It is unclear what positions she held before becoming head window teller.

2

immediately surrounding the unit reserve.[2]

According to official policy, tellers were to be audited at least three times a year, with audits occurring no more than 120 days apart. None of the tellers were given advance warning of the audits. In the ten months that Greer served as head window teller, her flexible credit account was audited four times and her unit reserve was audited three times. None of those audits revealed shortages in excess of allowable tolerances.

Postal policy further dictated that Greer's flexible credit account and unit reserve were to be audited at the same time. This rarely occurred, however. During Greer's tenure as head window teller, her unit reserve and flexible credit account were audited together only once, in August 1994. That audit, which occurred on August 18, examined both accounts simultaneously and revealed nothing unusual.

On August 30, 1994, Greer informed her supervisor that it appeared as if another person had gained access to the unit reserve safe, as the stamps were in disarray. An inspection of the safe revealed a shortage of $44,006 in postal stock. The next morning postal inspectors Carl Aarons ("Aarons") and Randall Till ("Till") audited Greer's flexible credit account and unit reserve and confirmed that Greer was short $44,006. A full investigation ensued, and in October 1995 Greer was indicted in United States District Court on one count of embezzlement in violation of 18

_____

[2] All of the station's employees knew the code for deactivating the alarms.

U.S.C. § 1711. Greer was convicted by jury trial and subsequently sentenced to 18 months imprisonment. The court ordered Greer to pay full restitution in the amount of $44,006.

Greer's attorney moved for judgment of acquittal at the close of the government's case, at the end of trial, and after the verdict was returned. All three motions were denied. Greer timely filed the instant appeal. She challenges the lawfulness of her conviction as well as the propriety of the restitution order.

## II. DISCUSSION

### A.

Greer argues that the district court erred in denying her motion for judgment of acquittal because there is insufficient evidence to support her conviction for embezzlement under 18 U.S.C. § 1711. We review a district court's denial of a motion for judgment of acquittal de novo. *United States v. Myers*, 104 F.3d 76, 78 (5th Cir.), cert. denied, 117 S. Ct. 1709 (1997). In evaluating the sufficiency of the evidence, our standard of review is whether, viewing the evidence in the light most favorable to the government, a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. 1982) (en banc), aff'd, 462 U.S. 356 (1983).

In this case, the Government was required to prove beyond a reasonable doubt (1) that Greer was a postal employee, (2) that postal funds came into her possession in her capacity as a postal

employee, and (3) that Greer converted those funds to her own use. 18 U.S.C. § 1711.  On appeal, Greer disputes only the third element.  Thus, we confine our inquiry to whether there is sufficient evidence that Greer wrongfully converted the missing postal funds.

The government's theory at trial was that Greer embezzled $44,006 by pocketing cash from stamp sales at her window.  The government alleged that Greer would account for the resulting shortages on a daily basis by making false "error correct" entries on the books of her flexible credit account.[3]  The government theorized that Greer was able to hide her embezzlement from routine audits by executing, on paper, false transfers of stamp stock from her flexible credit account to the unit reserve shortly before an audit was to occur.  The government alleged that the transfers worked to conceal the shortage by lowering the amount of postal stock that was expected to be in the flexible credit account.  The government claimed that Greer used the same technique, albeit in reverse, to hide shortages in her unit reserve.

With regard to the August 18 audit, which examined both accounts together and revealed no existing shortages, the government explained that Greer was able to avoid detection by requisitioning an additional $33,582 in stamp stock several days before the audit.  The government asserted that Greer used the new stamps to increase the amount of actual postal stock in her two

_____

[3]  An "error correct" is an entry made by the clerk to correct an erroneous entry for the sale of item (like stamps) from the window drawer.

5

accounts to acceptable levels.  The government posited that Greer was able to avoid detection by failing to place the requisition on the books until the day after the audit.

Obviously, the $33,582 requisition could not fully cover the $44,006 in stamp stock that was ultimately found missing.  The government, however, explained that Greer made up the difference by transferring, on paper, roughly $9,500 worth of postal stock to the category of "redeemed stock."[4] The government advised that while redeemed stock is normally counted during an audit, the redeemed stock in the unit reserve was not counted during the August 18 audit.  Instead, the auditor accepted Greer's assessment that there was $12,404 worth of redeemed stock in the unit reserve.  Thus, the government concluded that the results of August 18 audit were unreliable.

On appeal, Greer argues that the government's theory is not supported by the evidence.  Specifically, Greer contends that there is no evidence that she knew when the audits would occur or which accounts would be audited.  That evidence is critical, Greer maintains, because the government's theory is based on the assumption that she was able to avoid detection by initiating false transfers between the accounts shortly before an audit was to

---

[4]  "Redeemed stock" is the term used to refer to unusable or damaged stamps.  Redeemed stock is transferred to the unit reserve under the designation of "redeemed stock."  It is segregated from usable stock, but remains part of the unit reserve's balance for accounting purposes.

occur. Greer reasons that without proof of advance knowledge, we are left with the implausible conclusion that her scheme succeeded on luck alone. We do not find Greer's argument persuasive.

It is true that the record contains no *direct* evidence that Greer had advance knowledge of the audits. There is not, for example, evidence that Greer was in possession of a confidential audit schedule. But Greer forgets that a defendant's knowledge may be proven with circumstantial evidence. ***See United States v. Branch***, 91 F.3d 699, 737 (5th Cir. 1996), cert. denied, 117 S. Ct. 1467 (1997). And in that regard, the record contains ample evidence that Greer had advance knowledge of the audits.

Shortly before every audit Greer would mysteriously initiate numerous transfers of stamp stock between her two accounts. Similarly, Greer requisitioned new stamps just days before the August 18 audit, and inexplicably waited four days before placing the new stamps on the books. As in a securities fraud case, where unusual trading activity is circumstantial evidence that a defendant used inside information, Greer's aberrant conduct before the audits suggests that Greer knew when an audit was about to occur. Minimally, Greer's conduct gives rise to a reasonable inference that Greer, through experience or otherwise, was able to predict audits with a significant degree of certainty.

Importantly, even if we assume there is no evidence of advance knowledge, Greer's argument must fail because it does nothing to address the large quantity of evidence that was marshaled against Greer at trial. At trial, the government showed that Greer was the

7

only employee with access to the unit reserve safe. Although Greer reported that the safe had been robbed, there was no evidence of forcible entry and the station's security system was neither triggered nor turned off the night before. Curiously, the would-be thief left behind more than $120,000 worth of stamp stock and money orders.

An examination of postal records showed that Greer entered error corrects more frequently than her fellow clerks, often in amounts nearing $1,000. Andrew Smith, a window clerk who had been with the postal service for eleven years, testified that an error correct of more than $100 was considered large and a cause for concern. Greer's personal banking records revealed that Greer was making large cash deposits in her checking account on an almost daily basis. Those deposits generally correlated with Greer's error corrects.

As noted, the evidence also showed that Greer initiated an unusual number of transfers between her two accounts in the days preceding an audit. Those transfers frequently involved large amounts of stamp stock and were often questionable in nature. The day before the August 18 audit, for instance, Greer executed six separate transfers between her flexible credit account and unit reserve that failed to effect a net change in either account.

Finally, the government's case was bolstered by evidence that the $33,582 stock requisition was delivered to the Berry Street Station on August 15, 1998, but not placed on the books until August 19, the day after the audit. There was evidence that Daniel

8

Christopherson, a fellow employee, saw Greer place the requisition in her unit reserve before the August 18 audit. Inspector Aarons corroborated this account by explaining that the inventory lists produced during the August 18 audit show that all of the stamp stock in the requisition can be accounted for in Greer's two accounts as of the date of that audit. Greer admits, without explanation, that she transferred $9,500 in stamp stock to redeemed stock the day before the August 18 audit.

These facts are sufficient for a rationale jury to conclude that Greer embezzled the missing postal funds. That conclusion stands regardless of whether we accept Greer's contention that there is insufficient evidence that she had advance knowledge of the audits. Accordingly, we reject Greer's sufficiency of the evidence claim.

B.

Greer contends that her indictment should have been dismissed because postal inspector Aarons committed perjury when he testified before the grand jury. Greer alleges that Aarons told the grand jury that Greer's flexible credit account and unit reserve had never been subjected to a simultaneous audit when, in fact, such an audit had occurred on August 18. According to Greer, Aarons' perjured testimony was unduly prejudicial because it prevented the jury from learning of the results of the August 18 audit which, having revealed nothing unusual, were inconsistent with the government's theory. *Bank of Nova Scotia v. United States*, 108 S. Ct. 2369, 2374 (1988). Relying upon *United States v. Williams*, 504

9

U.S. 36, 46 (1992), Greer further contends that Aarons' testimony was so critical to the deliberative process that its tainted character destroyed the integrity of the grand jury's screening function.[5]

The government contends that Greer is barred from raising this issue on appeal as it was never raised below. Greer concedes that she never challenged the indictment in the district court, and that we must review this issue for plain error only. Accordingly, Greer must show that (1) an error occurred, (2) the error was clear or obvious, and (3) the error affected her substantial rights and influenced the district court proceedings. *United States v. Olano*, 113 S. Ct. 1770, 1777-78 (1993); *United States v. Calverley*, 37 F.3d 160, 162-64 (5th Cir. 1994) (en banc), cert. denied, 513 U.S. 1196 (1995). When these elements of plain error are present, a court may exercise its discretion to correct the error if it "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Calverley*, 37 F.3d at 164. Having

---

[5]  In *Williams*, the Supreme Court held that courts may not use their supervisory power over their own procedures "as a means of prescribing . . . standards of prosecutorial conduct in the first instance." *United States v. Williams*, 504 U.S. 36, 47 (1992). Instead, that supervisory power can be used to dismiss an indictment only where the purported misconduct "amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions.'" *Id.* at 46 (quoting *United States v. Mechanik*, 475 U.S. 66, 74 (1986)). The statutory prohibition against making a false declaration before a grand jury, set forth in Title 18 U.S.C. § 1623, was cited by the *Williams* Court as an example of one such rule. *Id.* at 46 n.6.

reviewed the record, the parties briefs, and the applicable law, we conclude that Greer has not established plain error.[6]

First, Greer has not shown that Aarons committed perjury when testifying before the grand jury. Additionally, Greer has not demonstrated that Aarons' testimony plainly constitutes a "violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions.'" *Williams*, 504 U.S. at 46 (quoting *United States v. Mechanik*, 475 U.S. 66, 74 (1986)). Accordingly, we deny Greer's claim that plain error resulted from the district court's failure to dismiss her indictment.

## C.

Greer contends that the district court erred in ordering restitution given her present and future inability to pay that award. Under Title 18 U.S.C. § 3664(d), a defendant has the burden of demonstrating that she lacks the financial resources to comply with a restitution order. 18 U.S.C. § 3664(d); *United States v. Reese*, 998 F.2d 1275, 1281 (5th Cir. 1993). In determining whether restitution should be ordered, a district court is required to consider "[t]he amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems

---

[6] Our review of this issue was severely hampered by Greer's failure to include a copy of the transcript of the grand jury proceeding (if there is one) in the appellate record.

11

appropriate." 18 U.S.C. § 3664(a). Normally, when a restitution order is appealed the standard of review is whether the district court abused its discretion in directing restitution. *Reese*, 998 F.2d at 1282. However, because Greer never raised this issue in the district court, we review the decision for plain error. *United States v. Stedman*, 69 F.3d 737, 741 (5th Cir. 1995), cert. denied, 116 S. Ct. 2512 (1996).

Here, Greer has not shown that the district court committed plain error in ordering restitution. At sentencing the district court expressly adopted the findings of fact contained in Greer's presentence report. Those findings include numerous references to Greer's financial status that satisfy the mandatory factors that a district court must consider under 18 U.S.C. § 3664(a).

Because Greer's ability to pay was considered, we cannot say that the restitution decision constitutes the type of clear or obvious error required under our plain error standard. Greer's challenge to the restitution order is rejected.

IV.

For the foregoing reasons, the district court is AFFIRMED.

12