REVISED APRIL 17, 2002

IN THE UNITED STATES COURT OF APPEALS


FOR THE FIFTH CIRCUIT

_____


No. 00-20558

_____


UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

DARRELL H. STROUSE; JAMES R. WILLIS,

Defendants-Appellees.

_____


Appeal from the United States District Court

For the Southern District of Texas

_____


March 20, 2002

Before HIGGINBOTHAM, DAVIS, and BENAVIDES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

A federal grand jury indicted Darrell Strouse and James Willis, both formerly of the Houston Police Department, for conspiring to violate the civil rights of Rogelio Oregon Pineda and

Pedro Oregon Navarro in violation of 18 U.S.C. § 241.  The district court dismissed the indictment because Pineda's[1] testimony before the grand jury was perjurious, and, according to the district court, tainted the grand jury's decision to indict the Defendants. We hold that perjury before the grand jury that was not knowingly sponsored by the government may not form the basis for a district court's dismissal of an indictment under its limited supervisory power over the grand jury process.  We REVERSE the judgment of the district court and REMAND for further proceedings.

I

In July of 1998, Strouse and Willis were members of the Houston Police Department's Divisional Gang Task Force.  Strouse commanded the Task Force for three precincts, and Willis was assigned to Strouse's unit.

On the evening of July 11, 1998, Willis and his partner Pete Herrada arrested Ryan Baxter and two minors for possessing drug paraphernalia associated with the use of crack cocaine.  During the course of the arrest, the officers learned that Baxter was on probation for a prior drug offense.  Baxter made the now-familiar "flip," identifying Pineda as his cocaine supplier and offering to assist the officers in apprehending Pineda.

---

[1]  For brevity, we will refer to the brothers Rogelio Oregon Pineda and Pedro Oregon Navarro by their mothers' maiden names. Thus, Rogelio Oregon Pineda will be referred to as "Pineda" and Pedro Oregon Navarro as "Navarro."

Then back at the precinct headquarters, officers, including the Defendants, laid plans for Baxter to purchase drugs from Pineda to confirm Pineda's status as a dealer. Baxter first arranged a buy at a Jack in the Box restaurant near Pineda's apartment, but Pineda failed to show. When Baxter paged Pineda a second time, Pineda told Baxter that Navarro would be at Pineda's apartment and would be able to sell Baxter the crack cocaine he needed. Per the officers' instructions, Baxter agreed. As Baxter and a group of officers approached the apartment, Strouse charted their plan. Baxter was to knock on the door to initiate the drug sale. When the door was answered, Baxter was to talk until police officers could take over. The officers maintain that the plan was to seek consent to enter the apartment. When Baxter knocked on the door, however, there was no response, and the group left.

As the officers were driving back to their headquarters with Baxter early on the morning of July 12, Pineda apparently called Baxter, telling him that he was now at the apartment and able to sell Baxter the cocaine that Baxter had requested. At least six officers returned to the apartment, including the Defendants and Herrada. The plan remained unchanged, except Strouse apparently stressed to Baxter that he was to "get down and out of the way" when the door was answered. Strouse also told Baxter that, to disguise his role, he would also be arrested.

The precise events that took place at Pineda's apartment during the second trip to the apartment are not clear. Most of the

3

officers lined up in a stairwell near Pineda's apartment, out of the immediate line of sight from the door to Pineda's apartment. Two officers were stationed outside, near the back windows of Pineda's apartment. Baxter knocked, and Pineda answered. Baxter then spoke with Pineda and moved forward inside the apartment. Once inside, according to Baxter, he heard the rustling of feet behind him and dropped to the floor. Officers, led by Herrada, who had his gun drawn, immediately entered the apartment announcing "Houston police" and "HPD."[2] According to Herrada, he rushed into the apartment only after Baxter hit the ground; he had not expected Baxter to fall and entered the apartment because he feared that Baxter may have been hurt. It is undisputed that the officers had neither a warrant nor consent to enter the apartment at any time.

Once inside, the officers handcuffed Baxter, Pineda, and Pineda's girlfriend, Nelly Mejia. Officer Herrada pursued Salvador Lopez, also an occupant of the apartment. Two other officers, Tillery and Barrera, proceeded to the back bedroom of the apartment. In the bedroom, they found Navarro holding a gun. As the officers approached the back bedroom, a shot--apparently fired by one of the officers--hit Tillery in the back of his bullet-proof vest. Various officers opened fire on Navarro, eventually firing more than thirty rounds of ammunition. Shot twelve times, Navarro

---

[2] Officer Herrada had been asked to stand closest to the door because he spoke both Spanish and English and it was not clear to the officers whether Pineda spoke English.

died at the scene.  Navarro never fired his gun.  No drugs were found in the apartment.

II

The Harris County district attorney convened a state grand jury to investigate the events of July 11 and 12.  Pineda and the Defendants testified before the state grand jury.  The state grand jury returned only one indictment, against officer Willis for misdemeanor trespass.  On trial, officer Willis was acquitted.

Following the acquittal, the Department of Justice convened a federal grand jury seeking indictments against officers involved in the July 12 raid for conspiring to violate and violating the civil rights of Pineda and Navarro.  The government called sixteen witnesses before the grand jury, including Pineda.  The prosecutors also read Pineda's state grand jury testimony to the federal grand jury and furnished them with a transcript of that testimony.  The Defendants did not testify before the federal grand jury.

In September 1999, the grand jury returned the indictment in this case charging conspiracy to violate the civil rights of Pineda and Navarro, in violation of 18 U.S.C. § 241.  Specifically, it charged that the Defendants:

> did willfully and knowingly conspire to injure, oppress, threaten, and intimidate Rogelio Oregon Pineda and Pedro Oregon Navarro in the free exercise and enjoyment of the rights secured to them by the Constitution and laws of the United States, that is, the right to be secure against unreasonable searches and seizures.

5

The grand jury did not indict the Defendants for actually violating the civil rights of Pineda and Navarro pursuant to 18 U.S.C. § 242, the object offense of the conspiracy. The Defendants moved to dismiss the indictment based on the fact that Pineda had offered material, false testimony before the state and federal grand juries.

In a careful exegesis, the district court found that "Pineda's entire testimony before the grand jury is severely tainted by his perjury," offering several examples of knowingly false statements by Pineda. They included: (1) he had never sold drugs; (2) he did not know Baxter; (3) he returned Baxter's page because he thought it might be a wrong number; (4) he did not know Baxter was coming to his apartment on the night of the raid; (5) police officers entered the apartment immediately as Pineda opened the door; and (6) a police officer immediately hit Pineda on the night of the raid and he lost consciousness. The district court also noted that Pineda had admitted in a civil deposition that he lied to the state and federal grand juries about these events.[3]

---

[3] On April 17, 2000, a Harris County grand jury indicted Pineda for two counts of aggravated perjury and one count of perjury. The two counts of aggravated perjury related in part to statements made under oath during the state grand jury proceedings. Pineda has since pled guilty to one count of aggravated perjury. The government maintains that because Pineda's guilty plea to state perjury charge is outside the record, this court cannot consider it on appeal. Because Pineda's plea of guilt to state perjury charges was not a basis for the district court's ruling and is unnecessary to our resolution of the case, we do not consider this evidence.

The district court then determined that Pineda's false statements were material because they related to whether entry by the officers was supported by exigent circumstances. Finally, the court rejected the government's argument that any perjury by Pineda did not harm the Defendants because there was sufficient truthful testimony before the grand jury to support the indictment returned and dismissed the indictment without prejudice on April 19, 2000.[4]

---

[4] The district court refused to impose a prejudice requirement, explaining that no such requirement had been adopted by this circuit. It nevertheless reviewed the record and concluded that the untainted testimony was insufficient to support a finding of probable cause.

The government here makes three primary arguments. First, that Pineda did not perjure himself before the grand jury. Second, that, even if Pineda lied, a dismissal of an indictment would be appropriate only if the court found that the government knew of the perjury and did nothing to rectify or prevent it. Finally, the government contends that any perjury by Pineda did not substantially influence the grand jury's decision to indict the Defendants.

We review the district court's factual finding of perjury for clear error and find none here.[5] As the district court noted, Pineda's testimony before the federal grand jury, particularly the portions of his state grand jury testimony read to the federal grand jury, contained numerous statements that Pineda knew to be false. Specifically, Pineda stated that (1) he had never sold or used cocaine, (2) he had never met and did not know Baxter prior to the events of July 12, (3) police officers entered his apartment instantly when he opened the door on the morning of July 12, and (4) he was beaten severely, perhaps even to unconsciousness, after they entered. Pineda has since acknowledged in a civil deposition that he knowingly made false statements during his grand jury testimony, further confirming the propriety of the district court's factual findings. We have no difficulty concluding that the

---

[5] *See United States v. Cathey*, 591 F.2d 268, 272 (5th Cir. 1979).

district court did not clearly err when it found that Pineda knowingly provided false information to the grand jury.

The materiality of Pineda's false statements is a legal issue that we review *de novo*.[6] The standard is "whether the false testimony was *capable* of influencing the tribunal on the issue before it."[7] We are to be mindful that "[f]alse statements 'need not be material to any particular issue, but may be material to collateral matters that might influence the court or the jury in the decision of the question before the tribunal.'"[8]

The grand jury was charged to investigate any denial of the civil rights of Pineda and Navarro. Pineda's lies, particularly about events inside his apartment, were undoubtedly capable of influencing the grand jury's determination of whether to indict the Defendants for violating Pineda's civil rights. Precisely how and when the police entered would bear on whether exigent circumstances required their warrantless entry into Pineda's apartment and thus on whether the Defendants violated Pineda and Navarro's right to be free of unreasonable searches. For that reason, we agree with the

---

[6] *United States v. Williams*, 993 F.2d 451, 455 (5th Cir. 1993), *abrogated on other grounds by Texas v. Cobb*, 532 U.S. 162 (2001).

[7] *Id.* (quoting *United States v. Salinas*, 923 F.2d 339, 341 (5th Cir. 1991)) (internal quotation marks omitted; emphasis in original).

[8] *Id.* (quoting *United States v. Damato*, 554 F.2d 1371, 1373 (5th Cir. 1977)).

9

district court that Pineda's false statements were material to the grand jury's investigation.

                                    IV

After indictment, the judiciary's role in policing the credibility of witnesses before a grand jury is minimal. It is true that we have authority to enforce the Grand Jury Clause by ensuring that grand juries act independently from the executive.[9] We may also, and indeed on occasion we must, use our supervisory power to safeguard the integrity of the grand jury process. The Supreme Court has, for example, recognized that a district court may use its supervisory power "to dismiss an indictment because of misconduct before the jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions.'"[10] The Supreme Court has also recognized that the supervisory power of Article III judges should be used "to implement a remedy for violation of recognized rights, to preserve judicial integrity by ensuring that

---

[9] *See United States v. McKenzie*, 678 F.2d 629, 631 (5th Cir. 1982).

[10] *See United States v. Williams*, 504 U.S. 36, 46 (1992) (quoting *United States v. Mechanik*, 475 U.S. 66, 74 (1986) (O'Connor, J., concurring in the judgment)); *see also United States v. Greer*, 137 F.3d 247, 251 n.5 (5th Cir. 1998).

a conviction rests on appropriate considerations validly before the jury, and finally, as a remedy designed to deter illegal conduct."[11]

That said, we are persuaded that perjury before the grand jury that was not knowingly sponsored by the government may not form the basis for a district court's dismissal of an indictment under its supervisory power.  The district court did not under its approach reach the question of whether the government knew of the perjury at the time it offered Pineda's testimony before the federal grand jury.  In denying the government's motion to reconsider, the district court observed:

> First, the Court again reminds the parties that Defendants moved to dismiss the indictment because it was based on false, material testimony.  Dismissals on this basis, if jeopardy has not attached, are without prejudice.  Whether the indictment could be dismissed with prejudice because of prosecutorial misconduct was not, and is not now, before the Court.  Moreover, the Government's admission that it presented state grand jury testimony which it now concedes may have been perjured is not an admission of prosecutorial misconduct.

The district court explained in dismissing the indictment that "the Court need not and does not reach the issue of the Government's knowledge or bad faith" and that "[t]his issue could not be resolved without a full evidentiary hearing."  In the absence of a finding of government misconduct, we hold that the district court was without authority to exercise its limited supervisory power to

---

[11]    *United States v. Hastings*, 461 U.S. 499, 505 (1983) (citations omitted).

dismiss the indictment on the basis of perjury before the grand jury.[12]

The district court and the Defendants have pointed to language in several cases as support for the proposition that a district court in an exercise of its supervisory power may dismiss an indictment for such material lies to a grand jury. We read these decisions to support the conclusion we reach today, including, for example, the following language from *United States v. Williams*:[13]

> Thus, *Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S. Ct. 2369, 101 L. Ed. 2d 228 (1988), makes clear that the supervisory power can be used to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those "few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions," *United States v. Mechanik*, 475 U.S. 66, 74, 106 S. Ct. 938, 943, 89 L. Ed. 2d 50 (1986) (O'CONNOR, J., concurring in judgment).[14]

Footnote 6, accompanying this text, states that "Rule 6 of the Federal Rules of Criminal Procedure contains a number of such

---

[12]  The indictment was dismissed without prejudice. *Cf. United States v. Welborn*, 849 F.2d 980, 985 (5th Cir. 1988) ("The supervisory authority of the district court includes the power to impose the extreme sanction of dismissal with prejudice only in extraordinary situations and only where the government's misconduct has prejudiced the defendant."); *cf. also United States v. Fulmer*, 722 F.2d 1192, 1195 (5th Cir. 1983) ("For this reason, we have held that a district court may dismiss an indictment with prejudice only where it has been shown that governmental misconduct or gross negligence in prosecuting the case has actually prejudiced the defendant.").

[13]  504 U.S. 36 (1992).

[14]  *Id.* at 46.

12

rules, providing, for example, that 'no person other than the jurors may be present while the grand jury is deliberating or voting,' Rule 6(d), and placing strict controls on disclosure of 'matters occurring before the grand jury,' Rule 6(e)."[15] The footnote then notes that "[a]dditional standards of behavior for prosecutors (and others) are set forth in the United States Code," listing "18 U.S.C. §§ 6002, 6003 (setting forth procedures for granting a witness immunity from prosecution); § 1623 (criminalizing false declarations before grand jury); § 2515 (prohibiting grand jury use of unlawfully intercepted wire or oral communications); § 1622 (criminalizing subornation of perjury)."[16]

The phrase "prosecutors *(and others)*" does not foreclose on its face a conclusion that a lying witness might support dismissal under the district court's supervisory power. Similarly, we stated in *United States v. Sullivan*[17] that "we refuse to adopt the proposition that, absent *perjury or government misconduct*, an indictment is flawed simply because it is based on testimony that later may prove to be questionable."[18]

The language from *Sullivan*, however, only states in passing a breed of rule this court refused to endorse, rather than one that

---

[15]   *Id.* at 46 n.6.

[16]   *Id.*

[17]   578 F.2d 121 (5th Cir. 1978).

[18]   *Id.* at 124 (emphasis added).

13

it did adopt.  In any event, any such reading of *Sullivan* would be superseded by *Williams*: "'the mere fact that evidence itself is unreliable is not sufficient to require a dismissal of the indictment'" and "'a challenge to the reliability or competence of the evidence presented to the grand jury' will not be heard."[19] Allowing courts to evaluate the quality of evidence presented to a grand jury would "'run counter to the whole history of the grand jury institution.'"[20]  This rule is so strongly enforced that evidence obtained in violation of the Fifth Amendment[21] and in violation of the Fourth Amendment[22] can be used before a grand jury without giving the district court power to dismiss an indictment.

Dismissing an indictment to punish the government for its misconduct, however, entails no implicit second-guessing of the grand jury and thus steers clear of the prohibition of *Williams*. Our approach today is supported by *Bank of Nova Scotia v. United States*,[23] in which the Supreme Court upheld a Tenth Circuit decision

---

[19]  *Williams*, 504 U.S. at 54 (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 261 (1988)); *see also id.* (noting that, under long-standing Court precedent, an indictment may not "be challenged 'on the ground that there was inadequate or incompetent evidence before the grand jury.'" (quoting *Costello v. United States*, 350 U.S. 359, 363-64 (1956))).

[20]  *Id.* (quoting *Costello*, 350 U.S. at 364).

[21]  *Id.* at 49.

[22]  *Id.* at 50; *see also United States v. Calandra*, 414 U.S. 338, 354 (1974).

[23]  487 U.S. 250 (1988).

14

refusing to uphold a dismissal of an indictment. The district court had rested its decision in part on its factual finding that "IRS agents gave misleading and inaccurate summaries to the grand jury just prior to the indictment."[24] The Supreme Court stated:

> Because the record does not reveal any prosecutorial misconduct with respect to these summaries, they provide no ground for dismissing the indictment. The District Court's finding that the summaries offered by IRS agents contained evidence that had not been presented to the grand jury in prior testimony boils down to a challenge to the reliability or competence of the evidence presented to the grand jury. We have held that an indictment valid on its face is not subject to such challenge.[25]

The *Nova Scotia* Court then recited the rule that unreliability of evidence presented to a grand jury will not support the use of the supervisory power to dismiss an indictment in holding that a district court has "no authority to dismiss [an] indictment on the basis of prosecutorial misconduct absent a finding that [the defendants] were prejudiced by such misconduct."[26]

Congress has proscribed false testimony by witnesses before the grand jury, regardless of the government's involvement or knowledge, and has authorized criminal sanctions against those giving such testimony.[27] However, the fact that 18 U.S.C. § 1623

---

[24] *Id.* at 260.

[25] *Id.* at 260-61.

[26] *Id.* at 261, 263.

[27] *See* 18 U.S.C. § 1623; *United States v. Abroms*, 947 F.2d 1241, 1245 (5th Cir. 1991).

15

can be violated without government knowledge and that criminal charges can be brought against the offending witness does not, by itself, suggest a supervisory reach beyond cases where the government knew of the violation of section 1623 at the time of the perjured testimony.  The phrase "(and others)" in footnote 6 supports this observation.  Most of the statutes listed with this phrase are primarily violated by persons other than prosecutors. In footnote 6, the Court is merely describing the general nature of these sections of the United States Code in service of enumerating the misconduct that "amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions.'"[28]  The import of the statements in footnote 6 must be read in light of the textual statement that the footnote accompanies, because footnote 6 by its own terms merely identifies the rules described generally in the textual statement.

*Williams* states that the rule limiting the use of the supervisory power to instances of violations of these rules arises from the depiction of the limits on the court's supervisory power in *Nova Scotia*.[29]  In other words, the *Williams* decision, by its own terms, ties its statement of the scope of the supervisory power to the holding in *Nova Scotia*.  In *Nova Scotia*, the Court did not use

---

[28]  *Williams*, 504 U.S. at 46 (quoting *Mechanik*, 475 U.S. at 74 (O'Connor, J., concurring in the judgment)).

[29]  *Id.*

the language regarding a "few, clear rules" from Justice O'Connor's concurring opinion in *United States v. Mechanik*.  The *Nova Scotia* Court did, however, hold that misleading and inaccurate summaries provided by IRS agents to a grand jury would not support the use of the court's supervisory power to dismiss the indictment "[b]ecause the record does not reveal any prosecutorial misconduct with respect to these summaries."[30]  What the *Williams* Court's explicit reliance on *Nova Scotia* makes clear, then, is that the "misconduct" that "amounts to a violation of one of those 'few, clear rules'"-- which the *Williams* Court held included certain provisions of the United States Code as well as sections of Federal Rule of Criminal Procedure 6--must involve government misconduct.

Furthermore, the language from Justice O'Connor's concurring opinion in *Mechanik*, which the *Williams* Court explicitly quotes, limits the scope of violations of these "few, clear rules" to the conduct of prosecutors.  In her opinion, Justice O'Connor observes:

> *Prosecutors* have been accorded similar leeway in presenting their cases to the grand jury, see, *e.g.*, *United States v. Adamo*, 742 F.2d 927, 936-938 (CA6 1984), cert. denied, 469 U.S. 1193, 105 S. Ct. 971, 83 L. Ed. 2d 975 (1985), but *they* are bound by a few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions.[31]

---

[30]   487 U.S. at 260.

[31]   475 U.S. at 74 (O'Connor, J., concurring in the judgment) (emphasis added).

17

Justice O'Connor then argues that Federal Rule of Criminal Procedure 6(d) is such a rule and that dismissal of an indictment is an appropriate remedy, in some cases, for violations of Rule 6(d).[32] Accordingly, the language in footnote 6 of *Williams* and the accompanying text, when read in the context of the two decisions from which the stated rule is drawn, supports our conclusion that an indictment may not be dismissed under a court's supervisory power for perjury which the government did not sponsor.

The immediate next sentence in *Williams* further supports this conclusion. There, the Court implicitly limited the scope of the supervisory power just discussed by stating:

> We did not hold in *Bank of Nova Scotia*, however, that the courts' supervisory power could be used, not merely as a means of enforcing or vindicating legally compelled standards of *prosecutorial conduct* before the grand jury, but as a means of *prescribing* those standards of *prosecutorial conduct* in the first instance--just as it may be used as a means of establishing standards of *prosecutorial conduct* before the courts themselves.[33]

As such, the *Williams* Court understood its own discussion to be limited to prosecutorial misconduct in violation of these "few, clear rules," notwithstanding the use of the phrase "(and others)."

The district court also relied on *United States v. Greer*[34] as support for its conclusion that perjury which the government did

---

[32]  *Id.* at 74-75.

[33]  504 U.S. at 46-47 (emphasis added).

[34]  137 F.3d 247 (5th Cir. 1998).

18

not knowingly sponsor is an authorized ground for dismissal under *Williams*. Specifically, that *Greer*, after reciting the language we quoted from *Williams*, noted that "[t]he statutory prohibition against making a false declaration before a grand jury, set forth in Title 18 U.S.C. § 1623, was cited by the *Williams* Court as an example of one such rule."[35] We are not persuaded. Like its source in footnote 6 of *Williams*, this statement in *Greer* is consonant with a rule limiting the court's use of its supervisory power to violations of section 1623 of which the government had prior knowledge. *Greer* holds only that, under a plain error analysis, the defendant had not shown any perjury was committed.[36] *Greer*'s further statement that the defendant had not demonstrated that the challenged testimony violates one of the "few, clear rules" under *Williams* may easily be read to be consistent with an insistence that the government know of the falsity of the testimony it sponsored.[37] Of course, because the *Greer* court found that perjury had not been demonstrated, it had no occasion to discuss the government's knowledge of the falsity of the testimony.

V

Our limit today of the use of our supervisory power is consistent with our treatment of the repercussions of perjury

---

[35] *Id.* at 251 n.5.

[36] *Id.* at 251.

[37] *See id.*

19

before a petit jury. Before a petit jury, the rule in this circuit is that "due process is not implicated by the prosecution's introduction or allowance of false or perjured testimony unless the prosecution actually knows or believes the testimony to be false or perjured."[38] We see little sense in a rule which would provide criminal defendants greater protection before the grand jury than defendants have at trial, where the use of perjured testimony arguably poses a greater threat, despite the defendant's opportunity at trial to confront the untruths. Finally, as the government aptly notes, a rule allowing dismissal of an indictment without a showing of government misconduct would open the door to attacks on grand jury evidence for which there are large incentives including discovery by the accused. The result would be the sort of "interminable delay" against which the Supreme Court long ago

---

[38] *United States v. Brown*, 634 F.2d 819, 827 (5th Cir. 1981); *see also May v. Collins*, 955 F.2d 299, 315 (5th Cir. 1992).

warned in the context of attacks on grand jury proceedings.[39]  A petit trial before the trial is just too much.

For the foregoing reasons, we conclude that the district court erred in dismissing the indictment.

REVERSED and REMANDED.

<span style="color:red">ENDRECORD</span>

---

[39]  *See Costello*, 350 U.S. at 363-64 ("Petitioner urges that this Court should exercise its power to supervise the administration of justice in federal courts and establish a rule permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence.  No persuasive reasons are advanced for establishing such a rule.  It would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules.  Neither justice nor the concept of a fair trial requires such a change.  In a trial on the merits, defendants are entitled to a strict observance of all the rules designed to bring about a fair verdict.  Defendants are not entitled, however, to a rule which would result in interminable delay but add nothing to the assurance of a fair trial."); *cf. United States v. Sullivan*, 578 F.2d 121, 124 (5th Cir. 1978) ("The only plausible effect Housand's recantation could have had on his grand jury testimony would have been to undermine its credibility, but we decline to adopt the proposition that grand jury testimony that has merely been thrown open to suspicion by postindictment events is an invalid basis for an indictment.  Such a rule of law would necessitate independent judicial review of the credibility of grand jury witnesses, an exercise that would seriously infringe upon the traditional independence of the grand jury.  We consequently hold that where subsequent events merely cast doubt on the credibility of grand jury witnesses, due process does not require the prosecution to notify the grand jury of those events and seek a new indictment.").

BENAVIDES, Circuit Judge, specially concurring in the judgment:

I cannot agree with the majority opinion that prosecutorial misconduct is always required before the district court may exercise its supervisory role over grand jury proceedings. The majority takes a very narrow view of the circumstances under which this may be done, relying on Supreme Court opinions that, while referencing prosecutorial misconduct in their analysis of the appropriateness of a district court's exercise of its supervisory powers, do not explicitly hold that such misconduct is required for the exercise of such powers. I am not convinced that the Supreme Court has cabined in the circumstances under which supervisory powers may be exercised to the extent suggested by the majority.

In *United States v. Williams*, 504 U.S. 36, 112 S.Ct. 1735 (1992), the Supreme Court explained that district courts may use their supervisory powers to enforce established rules and procedures intended to protect the integrity of the grand jury process. *Id.* at 46. The Court drew a distinction between the permissible use of supervisory powers for the purpose of enforcing existing rules, and the impermissible exercise of supervisory powers for the purpose of creating new rules to govern the grand jury system. *Id.* at 46-47. Thus, the Court stated that, as made clear by its decision in *Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct. 2369 (1988), "the supervisory power can be used

22

to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions.'" *Id.* (citing *United States v. Mechanik*, 475 U.S. 66, 74, 106 S.Ct. 938, 943 (1986)(O'Connor, J., concurring in judgment)). In a footnote to this statement the Court pointed out that, in addition to the standards outlined in Federal Rule of Criminal Procedure 6, other judicially-enforceable "standards of behavior for prosecutors (and others) are set forth in the United States Code." *Id.*, n.6. Among the rules that the Court specifically identified in *Williams* were 18 U.S.C. § 1623, which prohibits perjury before a grand jury, and 18 U.S.C. § 1622, which criminalizes the subornation of perjury. *Id.* Thus, *Williams* establishes that the prohibition of perjury is among "the few, clear rules" that a court may enforce using its supervisory powers. And by listing "standards of behavior for prosecutors *(and others)*" the Court intimated that misconduct independent of the government, if precluded by an established standard of behavior, could provide a basis for overturning an indictment. *Id.*(emphasis added).

Citing *Williams*, this Court has indicated that the "statutory prohibition against making a false declaration before a grand jury" exemplifies one of the "few, clear rules" intended to protect the

integrity of the grand jury's functions. *United States v. Greer*, 137 F.3d 247, 251 (5ᵗʰ Cir. 1998); *see also United States v. Sullivan*, 578 F.2d 121, 124 (5th Cir. 1978); *United States v. Cathey*, 591 F.2d 368, 271-72 (1979)(suggesting that witness perjury could provide a basis for investigating a grand jury indictment). Other circuits have also suggested that perjury before a grand jury, even without prosecutorial knowledge, can provide a basis for dismissing indictments returned by the grand jury in reliance on the perjured testimony. *See, e.g., United States v. Hyder*, 732 F.2d 841, 845 (11th Cir. 1984) ("[W]e refuse to adopt the proposition that, absent perjury *or* government misconduct, an indictment is flawed simply because it is based on testimony that later may prove to be questionable.") (emphasis added) (citations omitted); *United States v. Kennedy*, 564 F.2d 1329, 1338 (9ᵗʰ Cir. 1977) ("[O]nly in a flagrant case, and perhaps only where knowing perjury, relating to a material matter, has been presented to the grand jury should the trial judge dismiss an otherwise valid indictment returned by an apparently unbiased grand jury.").

The majority's opinion disagrees with this reading of *Williams*, arguing that the phrase "prosecutors (and others)" should be interpreted narrowly, as simply descriptive of the nature of the sections of the United States Code in relation to which prosecutorial misconduct would trigger the exercise of supervisory powers. *Ante* at 13, 16. In support of this interpretation, the

24

majority points to the fact that the Supreme Court has held on previous occasions that challenges to the reliability or competence of the evidence before the grand jury will not be heard. *Ante* at 14-16. Indeed, the majority notes that in *Bank of Nova Scotia*, the Supreme Court held that the fact that IRS agents gave misleading and inaccurate summaries to the grand jury was insufficient, in the absence of prosecutorial misconduct, to support a dismissal of the indictment because the complaint amounted to a challenge to the reliability of the evidence. *Ante* at 14-17.

But the Supreme Court's holding that challenges to the reliability of evidence will not be heard, and its application of that rule in *Bank of Nova Scotia*, have no bearing on the question of whether, where there is an actual finding of *perjury* before the grand jury, dismissal of the indictment is appropriate. The rule that challenges to the reliability of evidence will not be heard flows directly from the distinction drawn in *Williams* between enforcing existing laws governing grand jury procedures, and creating new rules for the grand jury. *Williams*, 504 U.S. at 46-47. Whereas to dismiss the indictment because of unreliability of the evidence would involve the creation of a new standard for the grand jury process, to dismiss the indictment because of perjury before the grand jury simply enforces existing legal standards.

The majority also points out that in *Mechanik*, which the *Williams* Court quoted, Justice O'Connor discussed the "few clear

25

rules which were carefully drafted and approved... to ensure the integrity of the grand jury's functions" in relation to prosecutors' obligation to follow those rules. *Ante* at 17. However, nothing in Justice O'Connor's statement indicates that those "few clear rules" apply exclusively to prosecutors; rather, as noted in *Williams*, the rules relating to behavior before the grand jury, such as the prohibition on perjury, apply to prosecutors "and others." *Williams*, 504 U.S. at 46 n.6.

The majority's final argument for requiring government misconduct before allowing dismissal of an indictment is that in *Williams* itself, the Court stated that "[w]e did not hold in *Bank of Nova Scotia*, however, that the courts' supervisory power could be used, not merely as a means of enforcing or vindicating legally compelled standards of prosecutorial conduct before the grand jury, but as a means of *prescribing* those standards of prosecutorial conduct in the first instance... It is this latter exercise that respondent demands." *Williams*, 504 U.S. at 46-47. The majority latches on to the fact that in this particular passage the Court spoke of prosecutorial misconduct, and argues that this suggests that the *Williams* Court understood the exercise of its supervisory powers to be limited exclusively to instances of misconduct by prosecutors, not others. *Ante* at 18. But the *Williams* Court's reference to prosecutorial misconduct in that passage is easily explained by the fact that the primary issue on appeal in that case

was whether dismissal of an indictment due to a prosecutor's failure to present exculpatory evidence before a grand jury was appropriate.    Because the central issue in that case was prosecutorial behavior, it was natural for the Court to speak in terms of prosecutorial misconduct.  To read into this language an additional, never before discussed, requirement of prosecutorial misconduct for the exercise of supervisory powers, is a stretch.  In the absence of a more explicit articulation of such a requirement by the Supreme Court, I would not limit a district court's exercise of its supervisory powers in this manner.

Beyond the fact that Supreme Court precedent does not sufficiently support the rule upon which the majority relies, it is important to bear in mind that perjury by an ordinary witness that is not sponsored by or known to the government can also corrupt the grand jury process.  Indeed, by criminally sanctioning the act of providing false material testimony to a grand jury, Congress has indicated that the integrity of grand jury proceedings depends in large part on grand jury witnesses providing honest testimony.[40] When a grand jury is provided with perjured testimony, the integrity of its deliberations and decisions are threatened.  That would seem to be precisely the sort of egregious, well-established

---

[40] Section 1623(d) supports the conclusion that Congress' primary aim in passing the perjury statute was to protect the integrity of the proceeding. That section provides that a person who has perjured himself before a grand jury can immunize himself from prosecution by recanting his misstatements and thus facilitating the restoration of the grand jury's integrity.  18 U.S.C. § 1623(d).

grand jury misconduct that courts may use their supervisory powers to correct.

I am sympathetic to the majority's concern that a rule allowing dismissal of an indictment without a showing of government misconduct would open the door to attacks on grand jury evidence, for which there would be great incentives. *Ante* at 20. However, it is only when a district court discovers that the grand jury process has been corrupted by a witness that knowingly deceived grand jurors by providing false testimony that the court may act to preserve the integrity of the grand jury process. This surely will be a rare occurrence. In order to invoke a district court's supervisory powers over grand jury proceedings, a defendant must demonstrate that a witness knowingly lied to a grand jury about matters material to the grand jury's investigation. In this case, the district court's findings were at least partially supported by such evidence, specifically an admission of perjury by the witness. Only when faced with an admission of or conviction for perjury, or other such substantial evidence, should a district court exercise its supervisory powers to determine the impact of the perjury on the grand jury process. Certainly, a district court could not overturn a grand jury's finding of probable cause based solely upon inconsistencies between the testimony of one witness and others. The majority also argues that it would be senseless to provide defendants greater protection before the grand jury than at trial, where due process is only violated if the prosecution knew of

28

perjury. *Ante* at 20. However, at trial defendants have a greater opportunity to participate and uncover falsehoods thanks to the adversary process, whereas at the grand jury stage perjured testimony is likely to go unchallenged. *See United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997).

I recognize that whether there is a prosecutorial misconduct requirement for the courts to exercise their supervisory powers is a difficult issue. However, it was not necessary to address it in the context of this case, inasmuch as the perjury did not prejudice the defendant. *See Bank of Nova Scotia*, 487 U.S. at 255 ("[A] federal court may not invoke supervisory power to circumvent the harmless-error inquiry prescribed by Federal Rule of Criminal Procedure 52(a)."). In the present case, the grand jury indicted the defendants for conspiracy to violate civil rights under 18 U.S.C. § 241, while, as noted by the district court, Pineda's perjurious testimony related to the possible existence of exigent circumstances justifying the Defendants' warrantless entry into Pineda's apartment. To be convicted of a conspiracy, defendants "need not... have committed the crime that was its object." *United States v. Manges*, 110 F.3d 1162, 1176 (5th Cir. 1997) (citations omitted). Thus, even if the Defendant's entry into Pineda's apartment may have been supported by exigent circumstances, the grand jury could have concluded that, prior to entry, the Defendants conspired to violate Pineda's and Navarro's rights to be

29

secure from unreasonable searches. Thus, Pineda's perjury before the grand jury constituted harmless error, a fact that provides an alternate basis for vacating the district court's ruling.

As a final note, while the majority does limit the circumstances under which the court may exercise its supervisory powers to situations where there has been prosecutorial misconduct, it vacates for further proceedings. I would point out that it has been the appellees' contention all along that the government did engage in misconduct, and that the district court should conduct an evidentiary hearing to determine whether the government had knowingly sponsored Pineda's perjury before the grand jury. Thus, the majority's own reasoning would suggest that rather than rejecting the claim, it should remand for a determination of whether there was misconduct that would invoke the district court's exercise of its supervisory powers.

For the foregoing reasons, I specially concur in the judgment only.