IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 01-21216

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOHN FORTE,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas
(00-CR-531-1)

March 24, 2003

Before GARWOOD, SMITH, and BARKSDALE, Circuit Judges.

PER CURIAM:[*]

Presenting numerous issues, many of which were not raised in district court, John Forte appeals his conviction and sentence for possession with intent to distribute cocaine. The principal issue is whether Forte had standing to challenge a seizure and search of suitcases (containing the cocaine) being delivered to him, but before he received them. **DISMISSED in PART; AFFIRMED in PART**, resulting in the conviction and sentence being **AFFIRMED**.

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

On 12 July 2000, a DEA Agent at a Houston, Texas, airport discovered freezer packs (containing cocaine in liquid form) in suitcases being transported by Angela Gegg and Marissa Laken. Gegg told the Agent that she and Laken were delivering the cocaine to Forte in Newark, New Jersey. Gegg and Laken agreed to cooperate with law enforcement by recording conversations with Forte and making a controlled delivery of the cocaine to him. That evening and the next morning, several conversations between Gegg and Forte were recorded.

That next morning (13 July), the women and several officers flew to Newark. When they arrived, Gegg called Forte and asked him to pick up Laken and her. Upon Forte arriving at the airport, Gegg handed him the suitcases; he was arrested.

In January 2001, Forte and Laken were charged with one count of possession with intent to distribute five kilograms or more of cocaine on 12 July 2000, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii) and 18 U.S.C. § 2, and a related conspiracy count. (Gegg had entered a plea agreement.)

Trial began in late August 2001, with Laken soon pleading guilty. At trial, the Government claimed: Forte contracted with Chris Thompson, an experienced drug trafficker, to supply Thompson with female drug couriers to transport cocaine; Forte recruited Gegg, Laken, and Jessica Robinson; prior to the July 2000 incident

for which Forte was indicted, Gegg and Robinson each made multiple drug-transport trips (some involving international travel) at Forte's direction; and, for that July incident, Forte contracted with Gegg and Laken to transport from Harlingen, Texas, to New York City collapsible coolers containing ice packs filled with cocaine.

Forte's defense was that he did not *knowingly* possess the cocaine. He testified he believed he was introducing Thompson to women who could discretely transport money.

In September 2001, a jury convicted Forte on the possession with intent to distribute count; it acquitted him on the conspiracy count. Forte was sentenced, *inter alia*, to a 168-month imprisonment term.

## II.

Trial had four days of testimony, among others, by Forte, Thompson, Gegg, Laken, and Robinson. Forte retained new counsel for this appeal. New counsel present 13 issues (some involve sub-issues) concerning pre-trial, trial, and sentencing; but, seven of those issues, as well as a portion of another, were not preserved in district court, including, for example, no motion for judgment of acquittal. The glaring difference between issues preserved and issues presented is, perhaps, explained by the fact that appellate counsel did not try this case; they are scouring a cold record in an attempt to find reversible error. That, of course, is their obligation to their client. On the other hand, nothing in this

opinion is intended to suggest that Forte's trial counsel should have preserved in district court the many issues being raised for the first time on appeal.

*For the pre-trial phase*, Forte contends:  (1) the freezer packs should have been suppressed because the warrantless seizure and search violated the Fourth Amendment; and (2) the court improperly denied his motion to dismiss the indictment for Government misconduct (presentation of perjured testimony to grand jury).

*For the trial*, he contends:  (1) the court denied him a valid challenge for cause, requiring him to unnecessarily exercise a peremptory strike against that juror and forcing him to accept another objectionable juror; (2) the prosecutor abused her work product privilege and improperly deprived him of witness statements; (3) the prosecutor improperly and repeatedly referred to Forte's exercise of his Fifth Amendment right to post-arrest silence and assistance of counsel; (4) the court improperly instructed the jury on willful blindness even though no evidence justified the instruction; (5) the court improperly instructed that the Government was not required to prove Forte knew the controlled substance was cocaine; (6) the court erred when it excused a juror after deliberations had begun and recalled an alternate; and (7) the evidence was insufficient to support his conviction for *knowing* possession with intent to distribute cocaine.

4

*For sentencing*, Forte claims the court improperly: (1) assessed him a management role; (2) failed to apply the safety valve guideline; (3) denied an "aberrant behavior" downward departure because it based its decision on acquitted count conduct; and (4) sentenced him more harshly solely because he went to trial and declined to cooperate.

The standard of review for the sufficiency challenge is presented *infra*. For the other issues, we normally review the district court's legal conclusions *de novo*; its factual findings, only for clear error. *E.g., **United States v. Chavez-Villareal***, 3 F.3d 124, 126 (5th Cir. 1993). A finding is clearly erroneous if we are left with the definite and firm conviction that a mistake has been committed. *E.g., **United States v. Hernandez***, 279 F.3d 302, 306 (5th Cir. 2002).

The many issues not raised in district court are reviewed only for plain error. FED. R. CRIM. P. 52(b); *e.g., **United States v. Garcia-Flores***, 246 F.3d 451, 457 (5th Cir. 2001). This narrow standard requires Forte to demonstrate a "clear" or "obvious" error that affected his substantial rights. ***Id***. Even then, we have discretion to correct the error and will generally do so only if it "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings". *E.g., **United States v. Calverley***, 37 F.3d 160, 164 (5th Cir. 1994) (*en banc*), *cert. denied*, 513 U.S. 1196 (1995).

5

A.

*For the pre-trial phase*, Forte contends: (1) the cocaine was discovered during a seizure and search that violated his Fourth Amendment rights and should have been suppressed; and (2) the indictment should have been dismissed because the Government presented perjured testimony to a grand jury.

1.

Forte maintains he had standing to contest the seizure and search and that they were unconstitutional. Because Forte lacks standing, we do not reach the latter issue.

In December 2000 (prior to trial), Forte joined co-defendant Laken's motion to suppress. In an extremely comprehensive and fact-intensive motion, with supporting documents and legal authority, Forte claimed, *inter alia*: he had standing to challenge the search of the suitcases carried by Laken and Gegg. The Government contested standing.

At the start of the suppression hearing, the district court ruled Forte had failed to make a *prima facie* showing for standing. It determined Forte's extensive joinder motion papers failed to state sufficient specific facts to show either (1) a possessory or ownership interest in the seized luggage or any of its contents or (2) his interest was one that society recognizes as objectively reasonable. The court reasoned, based on the allegations in those papers, that Forte had no reasonable expectation of privacy,

6

because all he owned, or expected to own, was the cocaine. The court offered Forte an opportunity to present *new* evidence related to standing; he declined. (Subsequently, Laken's motion to suppress was denied.)

The denial of a suppression motion is reviewed *de novo*. **United States v. Gomez**, 276 F.3d 694, 697 (5th Cir. 2001). Whether a defendant has standing to challenge a search and seizure is reviewed *de novo*; underlying factual findings, of course, only for clear error. *E.g., **id**.* Forte has the burden of demonstrating standing. **United States v. Wilson**, 36 F.3d 1298, 1302 (5th Cir. 1994). In reviewing a ruling on a motion to suppress (including standing), we review "the evidence taken at trial as well as the evidence taken at the suppression hearing". **United States v. Alvarez**, 6 F.3d 287, 289 (5th Cir. 1993), *cert. denied*, 511 U.S. 1010 (1994).

"In general, a person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premise or property has not had any of his Fourth Amendment rights infringed." **Wilson**, 36 F.3d. at 1302. *See also* **United States v. Krout**, 66 F.3d 1420, 1430-31 (5th Cir. 1995), *cert. denied*, 516 U.S. 1136 (1996). "Co-defendants ... may not assert the Fourth Amendment rights of their alleged partners in crime solely on the basis of their

7

interpersonal association." *United States v. Dyar*, 574 F.2d 1385, 1391 (5th Cir.), *cert. denied*, 439 U.S. 982 (1978).

As the district court held, to establish standing, Forte must show: (1) an actual, subjective *expectation of privacy* with respect to the place searched or things seized; and (2) that expectation is one society would recognize as *reasonable* (collectively reasonable expectation of privacy). *E.g., United States v. Cardoza-Hinojosa*, 140 F.3d 610, 614 (5th Cir.), *cert. denied*, 525 U.S. 973 (1998); *United States v. Thomas*, 120 F.3d 564, 571 (5th Cir. 1997), *cert. denied*, 522 U.S. 1061 (1998). To determine whether Forte had the requisite reasonable expectation of privacy, we consider several factors: "whether [Forte] has a [property or] possessory interest in the thing seized or the place searched"; "whether he has the right to exclude others from that place"; "whether he has exhibited a subjective expectation of privacy that it would remain free from governmental intrusion"; "whether he took normal precautions to maintain privacy"; and (not applicable here), "whether he was legitimately on the premises". *Cardoza-Hinojosa*, 140 F. 3d at 615.

In applying this test, the reasonable expectation of privacy *vel non* is reviewed *de novo*. *E.g., United States v. Vicknair*, 610 F.2d 372, 379 (5th Cir.), *cert. denied*, 449 U.S. 823 (1980). Again, underlying factual findings are reviewed only for clear error. *Id*. The following analysis demonstrates Forte lacked standing.

## a.

For the legitimate expectation of privacy prong (as opposed to whether society would recognize it as reasonable, discussed *infra*), and regarding the sub-issue of a property or possessory interest, Forte did not have either interest in the suitcases or their contents at any time prior to or during the search. First, he never owned the suitcases. Thompson and Jose Flores purchased them in Texas, and gave them to Gegg and Laken. Second, Forte did not own a single item in either suitcase. Thompson and Flores provided the coolers and freezer packs filled with cocaine; the suitcases contained those items, as well as the women's clothing and other personal belongings.

Forte confirmed this, testifying at trial that he was merely a courier, his role being to deliver the suitcases to Thompson; he testified that he did not even intend to open the suitcases because the contents did not belong to him and *he was to hold them for Thompson*. Moreover, Forte clearly did not possess the suitcases or their contents at the relevant time: for the search in Houston, Gegg and Laken were in sole possession of the luggage.

Regarding the right to exclude others from the suitcases, Forte had no right to exclude anyone. Only Gegg and Laken could have done so. (Voluntarily *vel non*, the women failed to exercise this right, providing access to the suitcases.)

9

Regarding both exhibition of a subjective expectation of privacy and precautions taken to maintain privacy, Forte did neither. He never had the suitcases in his possession until he met Gegg and Laken at the Newark airport; before then, while he was more than 1,000 miles away (in the New York area), the suitcases were purchased in Texas by Thompson and Flores and placed in the possession of Gegg and Laken. *Cf.* **Rawlings v. Kentucky**, 448 U.S. 98 (1980) (one who put drugs in another's purse had no reasonable expectation of privacy). The suitcases were unlocked, which is inconsistent with an expectation of privacy, *see, e.g.,* **United States v. Payne**, 119 F.3d 637 (8th Cir.), *cert. denied*, 522 U.S. 987 (1997), and were traveling openly on a common carrier as "checked" luggage, subject at least to inspection by airport security.

Forte claims standing because: the suitcases were being delivered to him; he took possession of them; and he claimed an interest in their contents. He notes: he made telephone calls checking on the arrival of the suitcases and assuring their safe delivery; he warned the women not to draw attention to themselves or raise any "red flags"; and, when Gegg threatened to abandon the suitcases at the Newark airport instead of delivering them to Forte's apartment, he went to the airport to receive them. (Forte asserts (for the first time in his *reply* brief) that the Government is precluded from contending Forte lacked standing because, at

10

trial (subsequent to pre-trial no-standing ruling), the Government took the position that Forte did all of these things.  No authority need be cited for the rule that we generally do not review issues first raised in a reply brief.)

Forte's actions are insufficient to vest him with standing. Although the suitcases may have been intended for him (so he could transfer them to Thompson), Forte did not have a property or possessory interest *at the time of the earlier search* and did not maintain a right to exclude others from the suitcases or freezer packs *at that time*.  Forte's actions reflect a desire to avoid detection by law enforcement; but, they do not demonstrate a generalized expectation of privacy in the suitcases or constitute *reasonable* precautions to exclude others.  *See* **Cardoza-Hinojosa**, 140 F.3d at 616 (citing **Rakas v. Illinois**, 439 U.S. 128, 143-44 n.12 (1969)) ("the 'subjective expectation of not being discovered' conducting criminal activities is insufficient to create a legitimate expectation of privacy").

Forte cites **United States v. Villareal**, 963 F.2d 770, 774 (5th Cir. 1992), for the proposition that persons do not lose their expectation of privacy in repositories of personal effects they send by private parties.  **Villareal** held the defendant had a reasonable expectation of privacy in a container he shipped by common carrier (a motor transport company) *to himself* using a fictitious name.  *Id.*  **Villareal** stated that a party does not

11

surrender expectations of privacy by sending closed containers by private parties. *Id*. A legitimate expectation of privacy *vel non*, however, is a fact-specific inquiry to be decided on a case-by-case basis, based on the totality of the circumstances. *E.g., **United States v. Haydel***, 649 F.2d 1152, 1155 (5th Cir. 1981), *cert. denied*, 455 U.S. 1022 (1982).

Obviously, this case is factually distinct from **Villareal** on a number of grounds, the most significant of which is that Forte lacked an ownership interest in the suitcases (or their contents). Further, in **Villareal**, no other party could have potentially consented to a search of the container (it was in the possession of the carrier at the time of the search). Here, Gegg and Laken had possession of the luggage, including the ability to exclude others.

In sum, Forte has not met his burden of demonstrating a legitimate expectation of privacy. *Cf.* **Payne**, 119 F.3d 637 (no legitimate expectation of privacy *in car,* where defendant did not own car and had not possessed or driven it; or *in suitcase,* where defendant only possessed it for a short time, it was zipped not locked, and identification tags did not name him).

b.

Even assuming Forte demonstrated a legitimate expectation of privacy, he cannot meet the second prong for standing — that expectation is one society would recognize as *reasonable*. *See* **Thomas**, 120 F.3d at 571. The cocaine was not in Forte's personal

12

possession and was, instead, being conveyed by common carrier in another person's luggage.

2.

Forte and Laken were indicted on two counts: (1) possession with intent to distribute cocaine; and (2) conspiracy in that regard. Forte claims the district court erred in denying his motion to dismiss the indictment because of the Government's knowing presentation of perjured testimony to the grand jury, as urged in Laken's August 2001 motion. Forte joined that motion.

Laken alleged that a DEA Agent presented perjured testimony to the grand jury to secure an indictment on two occasions (with three statements): the Agent testified in September 2000 that Gegg and Laken admitted they knew they were carrying drugs; and testified in January 2001 that Laken became involved in the case before her arrest in July 2000 and that Laken was instructed on how to preserve the cocaine. The court orally denied the motion to dismiss.

The denial of a motion to dismiss the indictment for Governmental misconduct is reviewed *de novo*. ***United States v. Johnson***, 68 F.3d 899, 902 (5th Cir. 1995). We review only for clear error factual findings regarding perjury, ***United States v. Strouse***, 286 F.3d 767, 771 (5th Cir. 2002), and prosecutorial misconduct, ***United States v. Bourgeois***, 950 F.2d 980, 984 (5th Cir.

13

1992).  The materiality of perjured statements is determined *de novo*.  **Strouse**, 286 F.3d at 771.

"Government misconduct does not mandate dismissal of an indictment unless it is so outrageous that it violates the principle of fundamental fairness under the due process clause"; such violations are found only in the rarest circumstances.  **Johnson**, 68 F.3d at 902 (internal quotation marks omitted).  The knowing presentation of perjured testimony *at trial* in order to secure a conviction constitutes such a due process violation.  *E.g.,* **Miller v. Pate**, 386 U.S. 1 (1967).  However, where the Government presents false testimony *to the grand jury*, the indictment may be dismissed only if the testimony is knowingly sponsored by the Government and material to the decision to indict.  *See* **Strouse**, 286 F.3d at 773-74.  A statement is material if it is capable of influencing the factfinder with regard to the issue before it.  **Id**. at 771.

As demonstrated *infra*, the Agent did not present false testimony.  Therefore, we do not reach the other elements necessary for the relief sought on this issue.

a.

The Agent immediately clarified *to the grand jury* that neither Gegg nor Laken admitted to knowingly transporting cocaine:

> *Just to clarify it*, when the girls [Gegg and
> Laken] ... were approached ... they said it
> was just cooler packs ... they eventually told

14

us that they weren't really sure what was in there ... and we explained ... we had seen narcotics transported in manners like this, and both girls didn't come right out and say, "Yes, I know that there's fourteen kilos of cocaine in there," but Marissa [Laken] says that she didn't actually open the suitcases ....

(Emphasis added.)

b.

Regarding whether the Agent testified falsely that Laken had been involved in the scheme since June 2000, there is trial testimony that: around that time (approximately one month before the arrests), Forte asked Gegg whether she would be interested in carrying cocaine hidden in coolers; she discussed this with Laken (her roommate); and the two decided "[h]ell, yeah, let's do it. Rock on".

c.

Regarding whether Forte gave both Laken *and* Gegg instructions on how to care for the freezer packs to prevent them from melting, Forte claims he spoke *only* to Gegg when she was in Houston on 12 July (day before arrest) and instructed her to put the "ice cream" on ice in a hotel bathtub to prevent it from thawing. As the Government points out, the instructions were intended for both women, who were operating together. Each had freezer packs of cocaine in her suitcase that had to be put on ice.

15

B.

*For the trial*, Forte contends: (1) the district court improperly denied him a challenge for cause, requiring him to use a peremptory strike and accept another unacceptable juror; (2) the prosecutor failed to turn over witness statements as required under the Jencks Act; (3) the prosecutor improperly used Forte's post-arrest silence against him; (4) the willful blindness instruction was not justified by evidence; (5) the instruction that the Government was not required to prove Forte knew the controlled substance was cocaine was incorrect; (6) the court erred in excusing a juror and substituting an alternate; and (7) the evidence was insufficient on the knowledge element to support his conviction.

1.

The first denied challenge for cause concerned prospective juror number 18. Forte maintains this denial was erroneous and caused him to unnecessarily use a peremptory strike, which forced him to accept another objectionable juror (number 25).

Forte challenged number 18 on the basis that she would give more credence to a police officer than to an ordinary citizen. Number 18 stated: she would not be open to the proposition that an officer would "stretch the truth"; she put officers in a different category than others (in terms of truth-telling); and she could not say whether it would be difficult for her to follow an instruction

16

that the law regards "everyone even" in terms of how to assess credibility. Relying on *United States v. Duncan*, 191 F.3d 569, 573 (5th Cir. 1999), *cert. denied*, 529 U.S. 1122 (2000), the district court denied the challenge and Forte used a peremptory strike.

Number 25 stated during *voir dire* that she: had a very close family member involved in drugs and alcohol; was not sure whether she could *not* let that experience affect her impartiality, but would try; and could not put her personal experience "out of [her] mind". The court then asked her whether she could conscientiously base her decision solely on the evidence at trial; she responded: "I would try to the best of my ability to do that". Forte challenged number 25 for cause. The court re-questioned the potential juror: "Can you base your decisions in this case solely on the evidence you hear in this courtroom?" She replied: "Yes, I think I can." The court denied the challenge and number 25 served on the jury.

A juror impartiality ruling is reviewed only for manifest abuse of discretion. *United States v. Munoz*, 15 F.3d 395, 397 (5th Cir.), *cert. denied*, 511 U.S. 1134 (1994). "We grant broad discretion to the trial judge in making determinations of impartiality and will not interfere with such decisions absent a clear abuse of discretion." *United States v. Hinojosa*, 958 F.2d 624, 631 (5th Cir. 1992).

17

Under the Sixth Amendment, Forte has a right to an impartial jury, including "the exclusion of a potential juror if his views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath". *Duncan*, 191 F.3d at 573 (internal citation omitted). The loss of a peremptory strike, however, does not violate the Sixth Amendment, as long as the jury is impartial.

> We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.

*Id*. (internal citation omitted). Accordingly, our inquiry is limited to the impartiality *vel non* of number 25. *See Ross v. Oklahoma*, 487 U.S. 81, 88 (1988).

The district court, which had the opportunity to evaluate the credibility of number 25, including her demeanor, did not commit a manifest abuse of discretion in denying the challenge. On the one hand, that juror expressed her frustration with a close family member who was involved in drugs and alcohol and who was currently proceeding in the court system. On the other hand, she testified she thought she could be fair and told the court she would try to the best of her ability to base her decision solely on the evidence. The court questioned number 25 regarding her ability to

18

decide the case based solely on that evidence; based on her answer, it was assured she could do so.

2.

The district court did not require the prosecutor to produce her notes of witness interviews (originally requested pre-trial). Forte claims the prosecutor abused her work product privilege by taking notes of witness interviews during preparation for trial, but not reducing those notes to statements.

At a November 2000 hearing on discovery motions, the district court ruled that neither side was required to preserve notes of witness interviews. At a June 2001 hearing, Forte requested witness statements by Thompson (hired Forte to recruit couriers). The prosecutor told the court that Thompson had not made any Jencks Act statements, but that she had debriefed Thompson and made notes. Forte responded that the Government was purposefully not writing reports of its witness interviews. The court ruled that the Government did not have to prepare such reports and determined that it had substantially complied with its discovery obligations. Nevertheless, the prosecutor provided her interview notes to the court for an *in camera* inspection.

The day before Thompson testified at trial, Forte's counsel again requested any interview notes or reports concerning Thompson's statements, as well as those of Robinson (courier not involved in July incident). The prosecutor responded that neither

19

Thompson nor Robinson had prepared a statement and there were no reports; she had only her handwritten notes of her interviews.

The court ruled that it would listen to the testimony, and if any of the prosecutor's notes were discoverable under the Jencks Act, **Brady v. Maryland**, 373 U.S. 83 (1963) (evidence favorable to the accused or useful to the defense for impeachment must be produced), or **Giglio v. United States**, 405 U.S. 150 (1972) (same), in the light of that testimony, it would provide the notes (in its possession) to the defense. The court also directed the Government to produce Thompson for an interview by Forte's counsel. Although the Government did so, Thompson apparently refused, of his own volition, to be interviewed when he met with Forte's counsel. After hearing the testimony and conducting its *in camera* review, the court determined that the notes contained no discoverable Jencks, **Brady,** or **Giglio** material.

A district court's decisions regarding discovery under the Jencks Act are reviewed only for clear error. **United States v. Hodgkiss**, 116 F.3d 116, 117 (5th Cir. 1997). And, even if we determine there was a violation, we conduct harmless error review. **Id.**

Under the Jencks Act, the Government must provide the defendant with witness statements relating to the subject matter on which the witness has testified. 18 U.S.C. §§ 3500(b), (e)(1). A "statement" includes a written statement made by the witness and

20

signed or otherwise adopted and approved by him, and a substantially verbatim recital of a statement made and contemporaneously recorded.  18 U.S.C. § 3500(e)(1), (2).  (**Brady** and **Giglio** hold the Constitution forbids the Government from suppressing evidence favorable to the accused or useful to the defense for impeachment of witness who testifies against the accused. 373 U.S. 83; 405 U.S. 150.)

In **United States v. Martino**, 648 F.2d 367 (5th Cir. 1981), *further unrelated proceedings at* 681 F.2d 952 (5th Cir. 1982), defendants raised essentially the issue being raised by Forte. They "condemn[ed] the manner in which the government conducted interviews with its witnesses ostensibly to avoid producing Jencks Act material", challenging its practice of interviewing potential witnesses during which no written or recorded statements were taken and maintaining the Government purposely failed to record the interviews or create "statements".  **Id**. at 387.  Noting that "[i]t is undisputed that interview notes taken by an interviewer during an interview with the witness do not qualify as a statement under the Jencks Act",  **Martino** held that the notes were not discoverable Jencks Act statements.  **Id**.

> No requirement has been brought to our attention that all interviews must be recorded or that interview notes must be reduced to writing and signed or otherwise approved by the witness.  We cannot presume that the prosecutor acted in bad faith by failing to reduce his notes to written form....  Indeed

21

only the foolish or exceptionally talented counsel will depend solely on his memory when preparing for the examination of a key witness. But the fact that counsel usually will take notes does not mean that these notes often will be "statements". Counsel rarely take down verbatim what witnesses say in these prepatory conferences. Consequently prosecutors' notes may be expected to meet the requirements of [the Jencks Act] very infrequently.

*Id*. (internal citations omitted).

In any event, the prosecutor's notes are not in the record. Thus, we cannot determine whether those notes are sufficiently detailed to constitute one of the "very infrequent" instances where they must be produced. "It is well-settled that the appellant bears the burden of creating the record on appeal. Fed. R. App. P. 11(a). If the record does not establish a basis for reversal, we must affirm." **United States v. Coveney**, 995 F.2d 578, 587 (5th Cir. 1993). *See also* **United States v. Myers**, 198 F.3d 160 (5th Cir. 1999), *cert. denied*, 530 U.S. 1220 (2000). Forte did not include the notes in the record. Lacking them, there is no basis on which we can hold that the failure to disclose them violated the Jencks Act (or, assuming it did, that the error was not harmless).

3.

During cross-examination of Forte, and in order to impeach his exculpatory story (believed only money being transported), the prosecutor raised Forte's post-arrest silence in conjunction with post-arrest interviews he gave:

22

Q. And you testified on direct that [the Agent] told you that you were under arrest for possession of cocaine. Remember that?

A. Yes.

Q. And when you were arrested for possession of cocaine and you were given an opportunity to explain your involvement you didn't claim ignorance, did you?

A. No, I did not.

Q. You didn't claim mistake, did you?

A. No, I did not.

Q. You didn't claim innocence, did you?

A. No. I asked for a call—I asked to call my lawyer.

Q. You didn't say, "Whoa, possession of cocaine? There's clearly been some mistake. I thought it was money," did you?

A. I asked to call my lawyer.

Q. As a matter of fact, when given the opportunity to explain your involvement to law enforcement in this operation that you now claim you thought was completely legal, you lied to them, didn't you?

A. Did I lie to them? In what respect?

Q. Well, let's go through it because you said that you don't really remember the conversation. But [the Agent] did. As a matter of fact, she made a report of that conversation.

A. Yes, she did.

Q. And she testified you lied to her, didn't she?

A. I'm not privy to that. Can we go over that again?

Q.   And you heard [the Officer] ask you how you got involved in the drug business, and you didn't say "Drug business?  I'm not involved in the drug business," did you?

A.   [The Officer] never asked me how I got myself involved in the drug business, she asked me how I got myself involved in this situation.

Q.   And when asked by [the Officer], you didn't say at that time, "I'm innocent.  I don't know anything about any cocaine," did you?

A.   I said, "Sometimes things happen beyond your control."

Q.   You didn't say to [the Officer] when she asked you how you got involved in this, "Hey, hey, wait a minute.  I thought this was money. I didn't know anything about cocaine," did you?

A.   No.

Q.   As a matter of fact, you didn't offer a denial to [the Officer], you offered an explanation?

A.   No.  I was in handcuffs.

Forte did not object during this colloquy.

Forte rested at the conclusion of his testimony, and the Government had no rebuttal evidence.  Shortly thereafter, a conference was held outside of the presence of the jury to discuss, *inter alia*, the time permitted for closing argument.  Pursuant to *Doyle v. Ohio*, 426 U.S. 610 (1976) (Due Process Clause prohibits impeachment of defendant's exculpatory story by using defendant's

24

post-arrest, post-*Miranda* silence), the district court *sua sponte* cautioned the prosecutor "to be awfully careful in final argument about any **Doyle** error". It noted that the Government was "allowed *to cross examine* [Forte]" about "inconsistent statements he gave to [the Agent] and other[s]" but recommended that she "stay away from it entirely" and cautioned her that, if she was going to use it, she should carefully read the **Doyle** precedent. (Emphasis added.)

Because Forte did not object to the reference to his post-arrest silence, we review only for plain error. *E.g.,* **Garcia-Flores**, 246 F.3d 451. Again, we will only reverse if, *inter alia*, there was a clear or obvious error that affected Forte's substantial rights.

As mentioned, **Doyle** held that the Due Process Clause prohibits using the defendant's post-arrest, post-**Miranda** silence to impeach his exculpatory story, offered for the first time at trial. It forbids the Government's exploitation of silence after the Government has helped induce it by informing the defendant of his right to remain silent. *E.g.,* **Jenkins v. Anderson**, 447 U.S. 231 (1980) (use of *pre-arrest* silence does not violate due process).

On the other hand, as the district court discussed with counsel, **Doyle** does not prohibit all use of post-arrest silence. For example, **Doyle** is not violated by the impeachment use of a defendant's voluntary statement made post-**Miranda** warnings. **Anderson v. Charles**, 447 U.S. 404, 408 (1980); **Pitts v. Anderson**,

25

122 F.3d 275, 279-83 (5th Cir. 1997).  In other words, and consistent with the above-referenced comment by the district court, "*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements", because "[s]uch questioning makes no unfair use of silence" and "a defendant who voluntarily speaks after receiving *Miranda* warnings had not been induced to remain silent".  *Charles*, 447 U.S. at 408.

a.

It does *not* appear that the prosecutor's references constituted *Doyle*-error.  Even assuming *arguendo* there was error, it was not plain error.  First, although the prosecutor clearly intended to use Forte's silence to impeach the story he offered at trial, it is not "clear" or "obvious" that this use violated *Doyle*.

Forte did not exercise his right to remain silent after his arrest and *Miranda* warnings.  He voluntarily waived his rights and agreed to be interviewed, without the presence of his attorney, by the Agent and later by the Officer referenced in the above-quoted colloquy.

During these interviews, Forte claimed he did not know the contents of the suitcases; at trial, he testified he had believed they contained money, not cocaine.  As such, the prosecutor's cross-examination may be viewed as an attempt to impeach Forte through the use of a prior inconsistent statement (permitted by *Charles*) rather than a plea for the jury to infer guilt from his

26

exercise of his Fifth Amendment rights (prohibited by **Doyle**). *See*

***Pitts***, 122 F.3d at 281 (most courts have held where post-arrest and trial statements involve the same subject matter and the post-arrest statement is sufficiently incomplete to be "arguably inconsistent", comments upon omissions are permitted).

b.

Even assuming a "clear" or "obvious" **Doyle** error, Forte has not shown it substantially affected his rights; nor has he shown the error was so significant that we should exercise our discretion to correct it. In cases where **Doyle** error has been held reversible, the critical error was the prosecutor's *closing argument* use of an inference of guilt from post-arrest silence. ***United States v. Rodriguez***, 260 F.3d 416, 421 n.2 (5th Cir. 2001), for instance, held the **Doyle** error was reversible,

> emphasiz[ing], that it was the prosecutor's foregoing final comment [during closing argument] that crossed the **Doyle** line. The prosecutor's questioning of [the defendant] during cross-examination was a permissible attempt to impeach....

*See also* ***Garcia-Flores***, 246 F.3d at 457 (gravamen of claimed **Doyle** violation focused on Government's closing argument). The prosecutor heeded the district court's advice and, during closing argument, did not refer to Forte's post-arrest silence.

27

4.

Forte claims the district court erred by instructing on willful blindness because the evidence was insufficient to support the instruction. During the charge conference, Forte agreed, however, that a willful blindness instruction *was* "appropriate". Therefore, the court, *without objection*, instructed as follows:

> You may find that [Forte] had knowledge of a fact if you find that [Forte] deliberately closed his eyes to what would otherwise have been obvious to him. While knowledge on the part of [Forte] cannot be established merely by demonstrating that [Forte] was negligent, careless, or foolish, knowledge can be inferred if [Forte] deliberately blinded himself to the existence of a fact.

Because Forte did not object, we review only for plain error. *See, e.g.*, FED. R. CRIM. P. 30, 52(b); **United States v. Gray**, 96 F.3d 769, 775 (5th Cir. 1996), *cert. denied*, 520 U.S. 1129 (1997). (In fact, because Forte expressly agreed to the instruction, the claimed error is arguably invited error. *See* **United States v. Pankhurst**, 118 F.3d 345, 349 (5th Cir.), *cert. denied*, 522 U.S. 1030 (1997) (agreeing in charge conference to later-challenged instruction nearly invited error).)

When reviewing a jury instruction, we determine "whether the charge, as a whole, is a correct statement of the law and whether it clearly instructed the jurors as to the principles of law applicable to the factual issues confronting them". **United States v. Farfan-Carreon**, 935 F.2d 678, 680 (5th Cir. 1991) (internal citations omitted). A "deliberate ignorance" or "wilfull

29

blindness" instruction is appropriate when "the facts support an inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct, and ... he purposefully contrived to avoid learning of the illegal conduct". *United States v. Fierro*, 38 F.3d 761, 772 (5th Cir. 1994), *cert. denied*, 514 U.S. 1051 (1995) (internal citations omitted).

Forte does not contend that the instruction misstated the law. Rather, he maintains the evidence was insufficient to support it because nothing demonstrated his conscious purpose to avoid enlightenment.

The instruction was supported by Forte's testimonial denial of his knowledge that Gegg and Laken were transporting cocaine and his claim he thought they were instead carrying money. *Inter alia*, Forte testified on direct examination as follows:

> Q. What did you start thinking, they're in Panama, they're in Mexico City, they're bringing money? Somehow your mind had to be working, like, what's all this about. I mean, just basic curiosity. Did you make any assumptions? If so, what were they?
>
> A. In all honesty, that was [Thompson's] business. So, I didn't think it was necessarily my place to delve into that as long as at the end of the day, he would stick to his end of the agreement and provide me the money....

5.

Citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), Forte maintains that, because a

30

quantity and type substance were charged in the indictment, the Government had to prove these elements beyond a reasonable doubt.

The court instructed the jury, *without objection*:

> The government is not required to show that [Forte] knew that the substance involved was cocaine. It is sufficient if the evidence establishes beyond a reasonable doubt that [Forte] possessed with intent to distribute a controlled substance.

Again, unobjected-to instructions are reviewed only for plain error.

Forte's contention is foreclosed by our recent decision in **United States v. Gamez-Gonzalez**, 319 F.3d 695 (5th Cir. 2003): the Government is not required to prove a defendant's *mens rea* regarding the *type* and quantity of a controlled substance for drug possession offenses.

6.

The district court excused a juror after deliberations had begun and substituted an alternate. Deliberations began late in the morning of 5 September 2001. Early that afternoon, the court received a note from the jury seeking direction because one of the jurors had limited English proficiency.

The court advised counsel that, if the juror was incapacitated, the court could excuse her and either proceed with only 11 jurors or substitute an alternate. It then conducted an evidentiary hearing (although one was *not* required) to determine if the juror was incapacitated. *See **United States v. Virgen-Moreno**,*

31

265 F.3d 276, 288 (5th Cir. 2001), *cert. denied*, 534 U.S. 1095 (2002).

The juror testified:  she only spoke a little English; she only understood the testimony in the case "[a] little bit, not too much"; and she was unable to communicate in English with her fellow jurors.  After giving counsel the opportunity to recommend additional questions for the juror (they had none), the court ruled that the juror was not conversant in English, did not understand the testimony, and could not read documents in English.  *Without objection*, the court excused the juror, recalled an alternate, and ordered the jury to begin its deliberations anew.

A district judge's decision to remove a juror he believes is impaired is reviewed only for abuse of discretion.  *E.g., **United States v. Huntress***, 956 F.2d 1309, 1312 (5th Cir. 1992), *cert. denied*, 508 U.S. 905 (1993).

> [I]t is within the trial judges's sound discretion to remove a juror whenever the judge becomes convinced that the juror's abilities to perform his duties become impaired.  We will not disturb the judge's decision unless we find that it prejudiced the defendant or another party.  Prejudice occurs ... when a juror is discharged without factual support or for a legally irrelevant reason.

*Id*. (internal citations omitted).

Forte maintains:  the juror was not incompetent; and, even if she were (and her dismissal proper), the district court should have

32

instead proceeded with 11 jurors.  Because Forte did not object, we review only for plain error.

a.

Dismissing the juror, who the court had good reason to believe was impaired (based on the jury's note and her own testimony), was not error, much less plain error; the decision fell well within the court's broad discretion.  The juror was dismissed with factual support and for a legally-relevant reason (inability to fulfill her duties as a juror).

b.

Likewise, substituting the alternate for the dismissed juror, rather than proceeding with 11, was not error, much less plain error.  Substitution is allowed by FED. R. CRIM P. 24(c)(3):

> **Retention of Alternate Jurors.**  When the jury retires to consider the verdict, the court in its discretion may retain the alternate jurors during deliberations.  If the court decides to retain the alternate jurors, it shall ensure that they do not discuss the case with any other person unless and until they replace a regular juror during deliberations.  If an alternate juror replaces a juror after deliberations have begun, the court shall instruct the jury to begin its deliberations anew.

Before the jury began its deliberations, the court permitted the alternate to leave the courthouse after instructing him not to discuss the case with anyone because he could be required to serve if one of the jurors became incapacitated.  The court also told the alternate it would call him and advise him once the jury had

33

reached a verdict. After the court excused the incapacitated juror, and before recalling the alternate, it confirmed, by telephone, that the alternate had not spoken to anyone about the case. And, consistent with the rule, post-substitution the jury was instructed "to begin its deliberations anew". Forte does *not* contend that the rule was not followed.

7.

Forte claims the evidence was insufficient to support his conviction for possession with intent to distribute cocaine. He challenges only the sufficiency of the evidence on the "knowledge" element, claiming the evidence establishes that he only knew *money* was being transported.

Forte did not move for a Federal Rule of Criminal Procedure 29 judgment of acquittal. Normally, evidence is sufficient if, after viewing all evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See, e.g., **United States v. Herrera***, 313 F.3d 882, 884 (5th Cir. 2002) (*en banc*), *cert. denied*, 71 U.S.L.W. 3567 (U.S. 3 March 2003) (No. 02-8782). However, where, as here, a defendant fails to request a judgment of acquittal, our review is limited, *inter alia*, to determining whether "the record is devoid of evidence pointing to guilt". ***Id***. at 885. *See also, e.g., **Delgado***, 256 F.3d 264, 274 (5th Cir. 2001).

34

Forte contends, on the other hand, that he preserved his sufficiency claim by objecting to the inconsistency of the verdicts (conviction for possession, acquittal for conspiracy). This contention is without merit. *E.g., **United States v. Haney***, 429 F.2d 1282 (5th Cir. 1970)(sufficiency of evidence not preserved where no motion for judgment of acquittal). In the alternative, Forte asserts (for the first time in his reply brief) that, *if* indeed there was no acquittal motion, then counsel was ineffective for failing to so move. Again, generally, we do not review issues raised for the first time in a reply brief. Even if we did, we would not review this ineffective assistance of counsel claim on this direct appeal; among other reasons, it has not been addressed by the district court. *E.g., **United States v. Armendariz-Mata***, 949 F.2d 151 (5th Cir. 1991), *cert. denied*, 504 U.S. 945 (1992).

Needless to say, the record is far from devoid of evidence that Forte *knowingly* possessed with intent to distribute cocaine. Three witnesses (Thompson, Robinson, and Gegg) testified that Forte knew cocaine was being transported.

There was evidence that, *inter alia*: Thompson was an experienced drug trafficker who contracted with Forte to recruit young females to transport cocaine; Thompson explained to Forte that the cocaine would be hidden in freezer packs to escape detection by drug-sniffing dogs and x-rays; Forte recruited Robinson in May 2000 to carry such packs from Panama to Mexico City

35

and then to Reynosa, Texas; and, upon Robinson's return, Forte explained to her the chemical process to liquify the cocaine for travel in the frozen freezer packs and then to extract it.

Regarding the count of conviction, there was evidence that, *inter alia*: Forte recruited Gegg and Laken to transport freezer packs of cocaine; although Forte told them they would be transporting cash, Gegg confronted him by telephone when she discovered (12 July 2000) she would be transporting cocaine; Forte directed Gegg to return to New York that night, before the ice packs melted (recorded conversation); when Forte learned the women could not return until the next morning, he instructed Gegg to put the "ice cream" on ice to prevent its melting (recorded conversation); "ice cream" was a code name for the freezer packs containing cocaine; Forte was concerned about the possibility of raising a "red flag" to law enforcement (recorded conversation); and, when Gegg arrived at the airport, she told Forte she was concerned that the "ice cream" could melt if she took a taxicab to his apartment, and he reassured her it would be fine (recorded conversation).

### C.

*For sentencing*, Forte contends: (1) the management-role enhancement should have been proven to the jury beyond a reasonable doubt and was otherwise improper; (2) the safety valve should have been applied; (3) Forte deserved an "aberrant behavior" downward

36

departure; and (4) he was punished for exercising his right to trial.

1.

For the leadership enhancement, Forte presents two claims. For the first time on appeal, he contends that the court erred by using a preponderance of the evidence standard in making the assessment. According to Forte, *Apprendi*, 530 U.S. 466, requires the managerial role to be proved to a jury beyond a reasonable doubt. Next, he contends that the facts did not support the enhancement; he maintains he did not manage anyone, but merely passed on Thompson's directions.

The district court adopted the Pre-Sentence Investigation Report (PSR) and increased Forte's base offense level by three for being a manager or supervisor, pursuant to U.S.S.G. § 3B1.1(b). It provides:

> If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.

Forte objected to the enhancement.

The *Apprendi* question is a legal issue, normally reviewed *de novo*. *See, e.g., United States v. Doggett*, 230 F.3d 160, 165 (5th Cir. 2000), *cert. denied*, 531 U.S. 1177 (2001). Because it was not raised in district court, it is reviewed only for plain error. Assignment of a leadership role is reviewed *only* for clear error.

37

*E.g.,* **United States v. Peters**, 283 F.3d 300, 314 (5th Cir. 1990), *cert. denied*, 535 U.S. 1071 (2002).

a.

Regarding **Apprendi**, the district court did not err, much less commit plain error, in applying the preponderance standard rather than requiring the jury to decide the leadership issue under the reasonable doubt standard.  Factual determinations by the district court that simply dictate a sentence within the statutorily allowed range are not called into question by **Apprendi**.  *E.g.,* **United States v. Miranda**, 248 F.3d 434, 444 (5th Cir.), *cert. denied*, 534 U.S. 980 (2001); **United States v. Garcia**, 242 F.3d 593, 599 (5th Cir. 2001).

In fact, we have specifically rejected the claim that **Apprendi** requires a leadership role to be proven to a jury beyond a reasonable doubt.  **United States v. Clinton**, 256 F.3d 311 (5th Cir.), *cert. denied*, 534 U.S. 1008 (2001).  Forte contends, however, that the recent decision in **Ring**, 536 U.S. 584, reinforces his reading of **Apprendi** and demonstrates our court has been reading **Apprendi** too narrowly.  **Ring**, however, simply held (consistent with our case law) that, where enumerated aggravating factors operate as the functional equivalent of an element of a greater offense, they must be proven beyond a reasonable doubt to the jury.  536 U.S. 584.  *See also* **United States v. Matthews**, 312 F.3d 652 (5th Cir. 2002) (post-**Ring**)(key factor in whether element must be proved to

jury beyond reasonable doubt is whether it exceeds statutory maximum penalty).

The leadership assessment did not operate as the functional equivalent of an element of a greater offense; in other words, it did not increase the sentence above the statutorily imposed range. Forte's sentence is within the statutory maximum of life.

b.

Nor did the district court commit *clear error* in assessing a management role. The enhancement requires an activity that involved five or more persons (Forte, Thompson, Gegg, Laken, and Flores) and a role as a manager or supervisor (but *not* as a leader or organizer, which warrants a greater enhancement). U.S.S.G. § 3B1.1(b).

In determining whether a role was managerial or supervisory, courts consider

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control exercised over others.

U.S.S.G. § 3B1.1 n.4. The purpose of the assessment is to punish more severely those who "tend to profit more [from an offense] and present a greater danger to the public and/or are more likely to recidivate." U.S.S.G. § 3B1.1, cmt.

39

Forte instructed the women regarding details; throughout the offense, Gegg called Forte for instructions. For example, Forte told the women to return to New York from Houston (12 July); when that was not possible, he instructed them to put the "ice cream" on ice. He also instructed them to exchange their tickets for a later flight on the same airline rather than fly on another carrier, in order to not raise suspicions.

Forte was a major participant, who worked closely with Thompson to coordinate the pick up, transportation, and delivery of cocaine. Thompson's cellular telephone records indicate 22 telephone calls between him and Forte on the day before the arrest. Forte also recruited the women, arranged their itineraries, and gave them directions (*e.g.*, where to go when they arrived in Harlingen). He kept in touch with them by telephone throughout the day, providing instructions and advice.

Regarding the fruits of the crime, Thompson agreed to pay Forte $10,000 on a per trip basis to recruit the female couriers. Forte was responsible for paying his couriers out of that amount. On 5 July 2000, Forte agreed to pay Gegg and Laken $1000 each for the Texas to New York trip. Thompson, not Forte, reimbursed the women for their travel expenses. Thus, Forte's net share was $8000, compared to $1000 for each woman.

Finally, Forte and at least four others transported approximately 13 kilograms of cocaine from Harlingen to Newark.

The entire operation took several days to execute and involved various hotels and airports in Harlingen, Houston, and Newark.

In sum, it is true that Thompson exercised more of a leadership role than Forte in organizing the offense. But, Forte's enhancement was for management, not leadership.

2.

Forte maintains the court failed to apply the safety valve guideline, U.S.S.G. § 5C1.2, because it improperly assessed him a management role. Forte did not object to not applying the reduction. Therefore, although whether to apply § 5C1.2 is normally reviewed for clear error, *United States v. Flanagan*, 80 F.3d 143, 145, here we review only for plain error.

To be eligible for the safety valve provision of 18 U.S.C. § 3553(f), adopted verbatim in U.S.S.G. § 5C1.2, a defendant must meet five requirements: (1) he did not have more than one criminal history point; (2) he did not use, or threaten to use, violence or possess a firearm; (3) the offense did not result in death or serious bodily injury; (4) *he was not a manager or supervisor*; and (5) he truthfully provided all information concerning the offense to the Government before the sentencing hearing. 18 U.S.C. § 3553(f); U.S.S.G. § 5C1.2.

Because Forte does not qualify for the safety valve reduction, there was no error, much less plain error. As discussed *supra*, Forte was properly assessed a managerial role; therefore, he does

41

not satisfy the fourth factor.  We need not address whether he provided information to the Government.

3.

According to Forte, the district court erred by denying a downward departure for aberrant behavior, based upon acquitted-count conduct.  He claims the court relied improperly on evidence pertaining to the conspiracy count, for which he was acquitted.  At the sentencing hearing, the district court ruled:

> [Forte] was involved in a sophisticated drug distribution scheme that got drugs from Columbia, to Mexico, to the United States, to New York and Canada.  He was an integral manager of that scheme, and he did it for the money over quite a long period of time.  So there was not an incident of aberrant behavior.  He was doing it for the money.  He was a professional drug dealer in it for the money.

Forte did *not* object to the now-claimed reliance on acquitted-count conduct as a basis for the downward departure denial.

The district court did not erroneously believe it lacked the authority to depart.  Instead, it refused to do so.  Therefore, we lack jurisdiction to review this issue.

> A defendant's general dissatisfaction with his sentencing range provides no ground for review of a district court's refusal to grant a downward departure. We have jurisdiction only if the refusal was in violation of the law. A refusal to depart downward is a violation of the law only if the district court's refusal is based on the mistaken belief that the court lacked discretion to depart.

42

*United States v. Garay*, 235 F.3d 230, 232 (5th Cir. 2000), *cert. denied*, 532 U.S. 986 (2001) (internal citations and footnotes omitted).

4.

Forte's final contention is that the district court improperly sentenced him, within the guidelines' range, more harshly than Gegg and Laken because he exercised his right to a trial and declined to cooperate. He asserts that the district court indicated its intention to depart downward based on disproportionate sentences given Gegg and Laken (18 months each), but ultimately declined to do so.

Before pronouncing sentence, the district court considered departing downward from the bottom of the guidelines range (168 to 210 months) to the ten-year mandatory minimum. Forte contended: he was a good person gone astray; he tutored an underprivileged youth; he received an extraordinary education; he used his musical career to promote morality; and he had no knowledge of, or control over, the purity of the cocaine. The Government objected to a downward departure, and the district judge held that none of the points Forte had raised justified one.

Next, the district judge expressed concern about the disparity between the proposed sentence for Forte and those given Gegg and Laken, noting: "Of course, that disparity is because of *a number of factors*: his role in the offense, [and] the fact that they pled

43

guilty and agreed to cooperate". (Emphasis added.) The court then asked the Government to explain what additional deterrent effect would be achieved, or penological interest served, by the additional 48 months Forte would serve at 168 months as opposed to 120 months (the mandatory minimum). The Government emphasized Forte's decision to go to trial rather than cooperate. The district court then declined to grant the downward departure.

As discussed *supra*, we have no jurisdiction to review a district court's decision not to depart from the sentencing guidelines, unless that court believed it lacked authority to do so. Regarding a departure on the basis of disparity, the district judge did not believe he could not depart; instead, he considered doing so and decided it would not be appropriate. Accordingly, we lack jurisdiction to review that decision.

III.

For the foregoing reasons, that portion of Forte's appeal concerning denial of a downward departure is **DISMISSED**; the rulings contested in the balance of the appeal are **AFFIRMED**. Accordingly, Forte's conviction and sentence are **AFFIRMED**.

44