United States Court of Appeals
Fifth Circuit

**F I L E D**

February 13, 2006

Charles R. Fulbruge III
Clerk

**REVISED MAY 23, 2006**

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 04-31138

UNITED STATES OF AMERICA,

Plaintiff-Appellee

VERSUS

CHRISTOPHER BAILEY,

Defendant-Appellant

Appeal from the United States District Court
For the Western District of Louisiana
(03-50041-01)

Before JONES, Chief Judge, and KING, and DENNIS, Circuit Judges.

PER CURIAM:[1]

The defendant, Christopher Bailey, appeals his conviction and sentence for committing cruelty to a juvenile at a place under the exclusive jurisdiction of the United States, in violation of 18

---

[1] Pursuant to 5th CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th CIR. R. 47.5.4.

1

U.S.C. §§ 7(3) and 13, incorporating La. Rev. Stat. § 14:93. Mr. Bailey argues that the evidence was insufficient to support the jury's findings that the crime was committed within the confines of Barksdale Air Force Base, a place under the exclusive jurisdiction of the United States, and that Mr. Bailey was the perpetrator of the crime. Mr. Bailey also argues that the district court's imposition of the maximum statutory sentence, 120 months, was unreasonable. We find none of Mr. Bailey's arguments convincing and affirm his conviction and sentence.

Background

In November and December of 2001, the defendant-appellant, Christopher Bailey, and his wife, Robin Bailey, lived with their infant son, P. B., on Barksdale Air Force Base near Shreveport, Louisiana. Robin, an active duty senior airman, worked nights on the base. Christopher, unemployed, stayed at home and cared for the baby, P.B.. The Baileys did not employ any child care worker, daycare, or babysitter, or have any relative care for the infant during this period.

On December 14, 2001, at about 2:00 a.m., Christopher called his wife from their home on the base and told her that the baby's "left arm moved where it shouldn't move." She immediately left work and the two took the baby to the emergency room of a civilian hospital in Shreveport, Louisiana. The emergency room doctor testified that Robin Bailey told him that the infant had not been

2

using his left arm for two days.  She also told the doctor that when she came home at about 5:30 a.m. on December 13, 2001, "she noticed that the infant was favoring his arm and when she picked him up, he would cry and he was more irritable."  In addition, she had observed that he had switched which fist or thumb he sucked, from left to right hands, and noticed before leaving for work on the 13th that he was guarding his left arm.  The baby had no bruises or external signs of injury or physical abuse, but appeared to experience pain when the doctor "palpated or pressed on the area of his upper arm."  The baby was slightly less than two months old. At this point in the emergency room visit, neither parent offered an explanation for the pain nor described any traumatic happening affecting the baby.

Dr. Bounds, the emergency room doctor, ordered x-rays of the arm to help determine the cause of the pain.  The x-rays revealed a fracture of the left humerus, a bone in the upper arm. The fracture was described as "acute," meaning recent, "displaced" meaning the two parts of the bone had moved apart, and painful. Further x-rays revealed another fracture, this one in the right ulna, one of two long bones between the wrist and elbow.  This fracture was non-displaced.

Dr. Bounds suspected abuse because two fractures are unusual in an eight-week-old child.  The doctor called hospital security, as a precaution, and went to talk with the Baileys.  The emergency

3

room nurse described Robin Bailey's behavior and concern as normal, she offered only one possible explanation, that perhaps the baby's blanket had been wrapped too tight.[2]  In contrast, Christopher Bailey offered the initial explanation that he had rolled over on the baby accidentally while the two were napping on the couch four days earlier.  He then offered several other explanations to investigators as follows: "Maybe that he might have dropped or almost dropped [P.B.] and caught him by his arm when he was playing.  Maybe he slipped through his arms and he grabbed him by his arm."  He also told an investigator that he may have pulled the child too hard to get him out of a car seat.  Christopher told the investigators that "[P.B.] had been favoring his left arm and crying more than normal for 2-3 days."

The emergency room doctor was required to report suspected abuse and notified both state and Air Force officials.  The Air Force and Louisiana Social Services sent investigators to the emergency room that morning.  The investigators interviewed the Baileys and the state took the infant into protective custody.

Later in the investigation the government learned that the Baileys had taken the infant to the pediatric clinic on the Base in November because of what looked like a rash on his face and a scratch on his eye.  P.B. was then about a month old. The nurse practitioner who saw the baby that day also testified at trial.

---

[2] Expert medical witnesses testified at trial that this could not have caused the baby's injuries.

4

She testified that the rash on the baby's face was "petechia" which she described as small bruises under the skin caused by trauma, or by coughing or vomiting. The Baileys told her that the baby had not been either coughing or vomiting. The nurse practitioner also noticed a "petechial rash in a linear patter on the arm." Christopher told her that the baby had rolled off the couch. The nurse practitioner thought this was odd because one-month-old babies are not physically capable of rolling over. She also observed that while Robin was appropriately concerned, Christopher was increasingly nervous as she asked more questions.

The nurse practitioner ordered a full skeletal x-ray. While nothing was detected at the time, during the investigation expert examination of those x-rays revealed something called a metaphyseal fracture in the infant's right radius, which is the other long bone between the elbow and the wrist. This fracture was described at trial as follows:

> It's a fracture that is seen only in patients 18 months and younger. It occurs at the ends of the bone, where the bone is still growing. The bones grow in length from the ends. And this Fracture occurs transversely across this weak bone. And it can be a very, very subtle fracture. It can be over looked without any problem.

Dr. Boos, an expert in child abuse, testified that P.B.'s metaphyseal was a classic metaphyseal fracture and further that:

> The classic metaphyseal fracture has been called the radiological finding that is most strongly associated with abuse, meaning there is no other thing you can find in an x-ray that presents stronger evidence -- no other single thing that you can find on an x-ray that presents stronger evidence of child abuse. The accidental

5

fracture of this type is barely ever seen.

Dr. Boos testified that this type of fracture is usually caused if the bones are "shaken or whipped side to side."  He also testified that at his age, P.B. was incapable of inflicting this injury on himself.

In addition to the testimony about the cause of the injuries to P.B., Dr. Boos also testified about the Baileys delay in seeking treatment.  He testified that the x-rays taken on December 14, 2001 revealed that the fractures in both arms had occurred some time prior to December 14.  He stated that he was concerned about the delay in seeking treatment because "whenever there is a delay in care seeking for an injury as severe as this, as painful as this, then we would worry why someone is not bringing the child in, and with, that, worry about child abuse."  He testified:

> Now, I would hope that any parent who has a child, a very young child, not quite two months, who stops using one extremity and has a change in temperament toward irritability would go to see the doctor.  Certainly a parent who knew that onset immediately after a trauma event would be on even greater notice to do so.

As discussed above, the Baileys told the Emergency Room doctor and investigators that they noticed at least some of P.B.'s symptoms two days before they brought him to the hospital or sought any medical attention.

During the trial the defense raised the possibility that P.B. had a condition called osteogenesis imperfecta, "brittle bone"

6

disease. P.B.'s little brother had been evaluated for that condition and the results had been equivocal. If P.B.'s little brother has the condition, which is genetic, there is a 50 percent chance that P.B. has it as well. The radiologist who examined P.B.'s x-rays at the hospital in September testified that his bones looked normal for a two-month-old, except for the fractures. Dr. Boos testified that P.B. did not have the characteristics of children with osteogenesis imperfecta (blue sclera, short for his age, etc.).

An expert for the defense, Dr. Harold Chen, chief of perinatal genetics at the Louisiana Health Science Center in Shreveport, Louisiana, testified about the different types of osteogenesis imperfecta including Type IV, a milder form of the disease, which was once considered rare but now is "one of the most common variable forms." He testified that a child with Type IV would not necessarily have blue sclera or be abnormally short. He, however, testified that he could not reach a conclusion about whether P.B. suffers from osteogenesis imperfecta of any type.

Dr. Boos admitted that if a child sustained fractures in a presumably safe environment it "would suggest that his bones are more fragile." However, P.B.'s foster mother, who has had custody beginning in May of 2003, testified that since he had been in her custody P.B. had not suffered any broken bones or other medical problems. She testified that she did not take any "special care"

7

with P.B. and that he engaged in usual activities for a child his age.

At the conclusion of the trial the jury convicted Christopher Bailey and acquitted his wife. At sentencing, the district court applied the, then mandatory, federal sentencing guidelines. The court used U.S.S.G. § 2A2.2, the guideline range for aggravated assault, finding it to be the most analogous guideline. The district court then upwardly departed from that range pursuant to U.S.S.G. § 5K2.21.

The court's upward departure was based on uncharged conduct discussed in the Pre-Sentence Report. Following the injury to P.B. and his removal from his parents' custody, the state of Louisiana awarded custody to his paternal grandmother, who lived in Colorado Springs, Colorado. Upon being discharged from the Air Force in 2002, Robin Bailey, together with her husband, moved to Colorado. The Baileys lived with P.B. and his grandmother. In February 2003, they had a second child, A.B.. On May 24, 2003, the Baileys brought A.B. to an emergency room in Colorado. X-rays revealed 20 fractures, including fractures to the femur, tibia, left ulna and ribs. The fractures were in different states of healing. The doctors also noted bruising to the infant's head and cheek.

When asked for an explanation, Robin Bailey told the doctors that P.B. had osteogenesis imperfecta, even though physicians had already ruled it out as the cause of P.B.'s injuries, and opined

8

that it could be the cause of A.B.'s injuries as well. The attending physician found that the injuries were non-accidental, and thus, inconsistent with osteogenesis imperfecta. As noted at trial, testing of A.B. for the disease was equivocal. The sentencing judge noted that A.B. had suffered no further injury once removed from his parent's care.

In addition, Christopher told the doctor that on the morning of May 24, at about 10:00 a.m., he noticed that A.B.'s leg appeared to be dislocated, but he and his wife left the baby with his grandmother in order to go house hunting and did not seek medical care until taking the child to the hospital at 5:00 p.m. A.B. was removed from his parent's custody.

At sentencing the defendant argued that this uncharged crime or crimes had not been proven at trial, but offered no further evidence attempting to disprove the facts as reported in the PSR. The court sentenced Christopher to the statutory maximum, 120 months imprisonment, to be followed by three years supervised release. As noted above, Mr. Bailey appeals both his conviction and his sentence.

**Analysis**

Conviction

Mr. Bailey claims that the jury was presented with insufficient evidence to support his conviction. He contends that the government did not prove that the offense occurred in a place

9

under the exclusive jurisdiction of the United States, in this case Barksdale Air Force Base, as required by the Assimilative Crimes Act, 18 U.S.C. §§ 7(3) and 13. He also argues that there was insufficient evidence to support the jury's finding that he was the perpetrator of any alleged cruelty to a juvenile, including (1) that his acquitted wife was equally likely to be the perpetrator, (2) that there was insufficient proof of cruelty or abuse, (3) that there was insufficient proof that the child suffered unjustifiable pain or suffering, and (4) that there was insufficient proof that he intentionally or negligently failed to seek timely medical care for the child. We are unconvinced by any, and all, of Mr. Bailey's arguments and, therefore, affirm his conviction.

*Standard of Review*

The defendant moved for acquittal following the government's case-in-chief and at the close of all of the evidence, therefore, in reviewing the sufficiency of the evidence this court reviews denial of the motion for judgment of acquittal de novo. *United States v. Greer*, 137 F.3d 247, 249 (5th Cir. 1998). To do so, the court determines whether, viewing all of the evidence in the light most favorable to the government, a rational trier of fact could have found that the elements of the offense were proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996); *United States v. Meyers*, 104 F.3d 76, 78 (5th Cir. 1997). "Direct and

10

circumstantial evidence are given equal weight, and the evidence need not exclude every hypothesis of innocence." *United States v. Dien Duc Huynh*, 246 F.3d 734, 742 (5th Cir. 2001)(citation and internal quotation marks omitted.)

*Sufficiency of the Evidence*

First, Mr. Bailey argues that there was insufficient evidence to prove that the alleged offense occurred within the confines of Barksdale Air Force Base. Mr. Bailey assumes without discussion that the government must prove this 'jurisdictional' element beyond a reasonable doubt. The government, however, points out *United States v. Bell*, a Fifth Circuit case from 1993 that has never been directly overruled. 993 F.2d 427 (5th Cir. 1993). *Bell* held that the preponderance of the evidence standard applies to the "exclusive or concurrent jurisdiction" element of the federal Assimilative Crimes Act. *Id.* at 429; 18 U.S.C. §13. This holding, as the government admits, has been questioned by a subsequent panel *United States v. Perrien*, 274 F.3d 936, 939 n. 1 (5th Cir. 2001). We share the *Perrien* court's concerns and likewise note the Supreme Court's discussions of the right to proof beyond a reasonable doubt afforded by the Due Process Clause and the Sixth Amendment. *See Apprendi v. New Jersey,* 530 U.S. 466, 476 (2000); *In re Winship*, 397 U.S. 358, 364 ("[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

11

crime with which he is charged."); *United States v. Gaudin*, 515 U.S. 506 (1995); *Patterson v. New York*, 432 U.S. 197 (1977). Again, however, we need not resolve the issue because we find that the government met the higher of the two burdens of proof.[3]  There was sufficient evidence for the jury to find beyond a reasonable doubt that the alleged crime was committed on Barksdale Air Force Base.

Mr. Bailey argues that the government case with respect to the actual situs of the crime was circumstantial. Mr. Bailey admits that the government proved that he, and his wife and infant son, lived on the base during the relevant time period, November and December 2001.  His brief also admits that at the time of the alleged crimes his wife worked on the base and that he was unemployed and the sole care giver during the times that his spouse was at work, generally between 9:00 p.m. and 5:00 a.m.  It is reasonable for the jury to infer that a two-month-old baby and his father would be at home between 9:00 p.m. and 5:00 a.m.  Mr. Bailey argues that the government produced no eyewitnesses placing the crime on the base.  It would be extremely unlikely for a parent to shake an infant, the kind of conduct, doctors testified, that would cause the kind of injuries suffered by P.B., in the presence of witnesses, making it reasonable for the jury to infer that such conduct occurred inside the home. *See Perrien*, 274 F.3d at 940.

---

[3] The jury was instructed to base its finding on this element using a beyond a reasonable doubt standard.

The defendant's own statements about when he noticed that the child was not using his arm and crying also support a jury finding that the defendant was criminally negligent in failing to seek medical care for his child while present on the military post.

Second, Mr. Bailey claims that there was insufficient evidence to prove that he, and not his acquitted co-defendant wife, was the perpetrator of the abuse. He argues that the evidence gave equal or nearly equal support to a theory of guilt or a theory of innocence, apparently referencing *United States v. Lopez*, which held that the court should reverse a conviction where the evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence." 74 F.3d at 577. Mr. Bailey suggests that he was convicted while his wife was acquitted because of alleged cultural stereotypes holding that "stay-at-home fathers," or men, in general, are more likely to be violent than "working mothers," or women, in general. He argues that the jury simply had to pick one of the parents, and they picked him.

We disagree, there are several things in the record that render the evidence unequal in its support of paternal and maternal alternative theories of guilt. Mr. Bailey was the parent with sole physical custody of the child for long periods of time. In addition, the pediatric nurse practitioner testified that when both parents brought P.B. into the clinic to have his eye and rash examined, Robin Bailey behaved like a normal mother in the

13

situation, while Christopher grew increasingly nervous as she asked more questions about the cause of the infant's condition. Further, Mrs. Bailey offered only one possible explanation for the fractures to P.B.'s arms. In contrast, Christopher Bailey made inconsistent statements to the doctor and investigators. "The evidence does not need to exclude every reasonable hypothesis of innocence; the jury is free to choose among reasonable interpretations of the evidence." *Perrien*, 274 F.3d at 939-940 (citations omitted). The jury in this case has done so.

Mr. Bailey also contends that the government failed to present sufficient evidence to prove the unjustifiable pain or suffering element of the incorporated Louisiana Cruelty to Juveniles statute. The defendant's appears to argue both that the infant was not in pain or suffering and that any pain or suffering was not unjustified as medical care was timely sought. Common sense and the x-rays presented to the jury alone make the argument that the child was not in pain almost ridiculous. The x-rays together with the parents' statements that the child was not using his arm, guarding his arm, and crying more than usual, and the expert testimony of three doctors that a fracture like the one in the infant's left arm would be painful, are certainly enough to support a jury verdict as to this issue.[4]

---

[4] The defendant notes that no pain medication was administered in the emergency room and that at the time the infant was brought in the child was not crying or outwardly

14

As for the argument that the pain and suffering were not unjustifiable because the Baileys brought the child to the hospital in a timely fashion, we note that the cause of the injuries is also relevant to the unjustified nature of the pain. In any event, the parents' testimony indicates that they noticed that the baby was not using his arm, guarding it, and crying more than usual for two to three days. One doctor placed the fractures as happening anytime between immediately before the x-rays to two or three days earlier. Another expert testified that the fractures of the ulna and humerus had likely occurred some time prior to December 14, the day the baby was brought to the emergency room. He explained that the x-rays supported this finding because generally a few days after the fracture, the fracture line on a x-ray is widened as the body cleans up the bone fragments and begins to heal. In the x-rays of P.B. taken on December 14 the fracture line on his humerus was "quite wide." In combination, the history provided by the parents and the x-rays provide sufficient evidence for the jury to find beyond a reasonable doubt that the pain and/or suffering of P.B. caused by the delay in treatment was unjustified.

### Sentence

The defendant was sentenced on October 28, 2004, before the

exhibiting signs of distress. The medical significance of the absence of the administration of pain medication was not explained at trial, nor was the lack of outward signs of distress during that particular time period. The left arm was put in an immobilizing sling.

15

United States Supreme Court decided *United States v. Booker*, 543 U.S. 220 (2005). The defendant has not, however, raised any argument before this court based on *Booker*.[5] Instead, the defendant is arguing that the district court misapplied the sentencing guidelines, that the district court erred in upwardly departing from the guidelines on the basis of uncharged conduct, and that the sentence was, on the whole, unreasonable.

### *Standard of Review*

This court reviews a district court's pre-Booker determination of the appropriate guideline range de novo. *United States v. Villegas*, 404 F.3d 355, 359 (5th Cir. 2005)("We conclude that when a district court has imposed a sentence under the Guidelines, this Court continues after Booker to review the district court's interpretation and application of the Guidelines de novo.") As discussed in *United States v. Smith* and *United States v. Saldana,* after *Booker*, we review an upward departure for reasonableness, but in doing so we use an abuse of discretion standard. *Smith*, 417

---

[5] This is perhaps wise. Mr. Bailey raised a *Blakely* based objection at sentencing and, therefore, review is for harmless error*. Blakely v. Washington*, 542 U.S. 296 (2004); *United States v. Pineiro*, 410 F.3d 482 (5th Cir. 2005). While the burden is on the government to prove that the error is harmless, the district court did depart from the guidelines and sentence the defendant to the statutory maximum. As the defendant has waived the argument on appeal, we need not decide whether this is enough, standing alone, to prove that the court would not have sentenced the defendant differently under an advisory scheme. *Cf. United States v. Woods*, 440 F.3d 255 (5th Cir. 2006)*; United States v. Cunningham*, 405 F.3d 497, (7th Cir. 2005)

F.3d 283, 489-90 (5th Cir. 2005); *Saldana*, 427 F.3d 298, 308 (5th Cir. 2005).

*Applicable Guidelines Range*

The district court applied U.S.S.G. § 2A2.2 as the most analogous offense guideline for the conviction for "cruelty to a juvenile" under the Assimilative Crimes Act. 18 U.S.C § 13; *see, e.g., United States v. Calbat*, 266 F.3d 358 362 (5th Cir. 2001); *United States v. Marmolejo*, 915 F.2d 981, 984 (5th Cir. 1990). The defendant argues that the district court should have applied U.S.S.G. § A2.3 because P.B.'s injuries did not rise to the level of "serious bodily injury" as the term is defined by the Guidelines and used in U.S.S.G. § 2A2.2.

"Aggravated assault" is defined in the application notes to U.S.S.G. §2A2.2 as: "[F]elonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; or (C) an intent to commit another felony." Subsections (A) and (C) are not at issue, and thus the definition of "serious bodily injury" is key. The Sentencing Guidelines define the term as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1.

Mr. Bailey argues that P.B.'s injuries were not this severe.

17

He argued, as discussed above, that P.B. suffered no pain.  He also argues that no surgery, or physical rehabilitation was necessary and that P.B. was not "hospitalized," but merely treated in the emergency room and admitted to the pediatric intensive care unit for security reasons and not for medical treatment.  The definition of severe bodily injury, however, also includes the "protracted impairment of a function of a bodily member."  This Circuit has noted that severe bodily injury includes temporary severe injury.  *See United States v. Price*, 149 F.3d 352 (5th Cir. 1998).  A displaced fractured humerus is impairment of the function of a bodily member.  The baby's arm was placed in an immobilizing sling, and had stopped using the arm even before the emergency room visit.  In addition, at least one other circuit has held a fracture to be a serious bodily injury. *United States v. Reese*, 2 F.3d 870, 897 (9th Cir. 1993)("'Serious' injury is defined in relevant part to include "injury involving  . . .  the impairment of a function of a bodily member. . . ." U.S.S.G. § 1B1.1 at Application Note 1(j). [The victim] was diagnosed with a fractured elbow and ordered to wear a sling, and testified that he was unable to write out the complaint he wished to file with the OHA police because of his injury. His injury thus unquestionably falls within the definition set forth by the Guidelines."). We find no error in the district court's use of  U.S.S.G. § 2A2.2 as the most analogous guideline offense.

18

*Upward Departure*

The district court upwardly departed from a guidelines' range of forty-six (46) to fifty-seven (57) months and sentenced Mr. Bailey to the statutory maximum of 120 months. The upward departure was based on U.S.S.G. § 5K2.21, which provides:

> The court may increase the sentence above the guideline range to reflect the actual seriousness of the offense based on conduct (1) underlying a charge dismissed as part of a plea agreement in the case, or underlying a potential charge not pursued in the case as part of a plea agreement or for any other reason; and (2) that did not enter into the determination of the applicable guideline range.

The district court expressly adopted the findings of the U.S. Probation Office as contained in the Pre-Sentence Report and as discussed above based the departure on uncharged conduct described therein, specifically injuries sustained by P.B.'s younger brother A.B. The court found that the behavior of the defendant with respect to A.B. was not charged or included in relevant conduct. He also found that both children were removed from Mr. Bailey's custody and placed in foster care. He also found that the injuries to both children were severe and involved multiple fractures. He further noted that after being removed from the custody of the defendant and his wife the children had "flourished" and that neither had since suffered physical injury of any kind.

Mr. Bailey objected to the upward departure at sentencing and renews his objections here. First, he argues that the court heard

19

no evidence about the extent of A.B.'s injuries. At sentencing, however, he couched his objection in terms of a failure to prove the facts to a jury, and when the court asked if he was contesting the accuracy of the information his attorney said "No, sir." It appears the "information" being discussed was the fact of the injuries and the removal of the children, and not the defendant's responsibility for those injuries and consequent removal. This seems to be the most reasonable interpretation of the exchange because later in the sentencing hearing Mr. Bailey argues the possibility, discussed at trial, that A.B. has osteogenesis imperfecta and that it was this disease, and not any abuse, that caused the twenty broken bones A.B. suffered as an infant.

"Presentence reports generally bear indicia of reliability sufficient to permit reliance thereon at sentencing." *United States v. Cabrera*, 288 F.3d 163, 172 (5th Cir. 2002); *accord United States v. Huerta*, 182 F.3d 361, 364 (5th Cir. 1999).

> Although a district court must resolve disputed issues of fact if it intends to use those facts as a basis for sentencing, see Fed.R.Crim.P. 32(c)(3)(D), the court can adopt facts contained in a PSR without inquiry, if those facts had an adequate evidentiary basis and the defendant does not present rebuttal evidence. *United States v. Rodriguez*, 897 F.2d 1324, 1328 (5th Cir.), cert. denied, 498 U.S. 857, 111 S.Ct. 158, 112 L.Ed.2d 124 (1990). Furthermore, the defendant has the burden of showing that information that the district court relied on in sentencing is materially untrue.

*United States v. Puig-Infante,* 19 F.3d 929, 943 (5th Cir. 1994). In this case, the defendant failed to put on any rebuttal evidence

20

at sentencing. At best, he referred to evidence introduced at trial about the possibility that his son A.B. has osteogenesis imperfecta. As discussed above, a skin biopsy performed on A.B. to test for the disease was equivocal and no doctor testified that A.B. had been diagnosed with the disease. The sentencing judge specifically noted that A.B. had flourished since being removed from his father's custody and apparently remained unconvinced by Mr. Bailey's argument that his son suffered from osteogenesis imperfecta and not child abuse. The uncharged conduct described in the PSR adopted by the trial court and which the court specifically discussed in its sentencing decision is sufficient to support an upward departure under U.S.S.G. § 5K2.21. We find no abuse of discretion in the district court's decision to upwardly depart from the applicable guidelines' range.

Finally, Mr. Bailey argues that his 120-month sentence, as a whole, is unreasonable. *See* 18 U.S.C. § 3553(a). He argues that he is not the worst kind of offender for whom the statutory maximum punishment should be reserved. He points out that he was a first time felony offender, a new parent, and only twenty-one at the time of the offense. He also argues that the crime had no pecuniary motive and did not entail planning or forethought. Finally, he emphasizes that the incorporated Louisiana cruelty to juveniles statute includes not only intentional conduct, but also criminally negligent treatment or neglect. The defendant asserts that the jury could have found him guilty based only on a finding of neglect

or criminal negligence, and thus, a sentence at the statutory maximum is unreasonable. We disagree. We address Mr. Bailey's last argument first. The statutory maximum for this criminal statute is specific to the crime. The statutory maximum applies equally to intentional and criminally negligent mistreatment or neglect. La. Rev. Stat. § 14:93. The Louisiana Legislature apparently concluded that some instances of criminally negligent mistreatment could warrant ten years imprisonment. In this case, it is possible that the jury convicted based only on a finding of criminal negligence. The sentencing judge, however, appears to have found that the mistreatment was intentional. He also specifically noted the severity of the injuries to both children. Given the vulnerability and defenselessness of the infants, the severity of the injuries, the failure to timely seek medical attention, the repeated instances of abuse, and the lack of any expressed remorse, we find that the sentence imposed by the trial court was reasonable.

AFFIRMED.