United States Court of Appeals
Fifth Circuit

**F I L E D**

**February 15, 2007**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
for the FIFTH CIRCUIT**

No. 06-50076

UNITED STATES OF AMERICA

Plaintiff-Appellee,

VERSUS

GEORGE REFF, SR.,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, SMITH, and DeMOSS, Circuit Judges.

PER CURIAM:

### INTRODUCTION

Defendant-Appellant George Reff Sr. challenges his conviction for "First Degree Murder on a Government Reservation." The primary issue on appeal is whether the Government sufficiently proved that Reff was "[w]ithin the special maritime and territorial jurisdiction of the

United States" when he committed the murder. *See* 18 U.S.C. § 1111(b).

## FACTUAL BACKGROUND

On December 31, 2003, at approximately 10:39 p.m., the Fort Hood Military Police ("MP") notified United States Army Criminal Investigation Command ("CID") that a traffic accident had occurred on Hood Road near the visitors center. The MP relayed to CID information from an eyewitness who was traveling northbound on Hood Road when the accident occurred.[1]

The witness stated that as she approached the visitors center she saw a dark sedan parked in the median of Hood Road. Then, another car traveling northbound near the visitors center passed the parked sedan and, as soon

---

[1]The visitors center is located on the east side of the northbound roadway of Hood Road. The record establishes that Hood Road consists of two roadways separated by a median. Each roadway has two lanes running in a northbound or southbound direction between U.S. Highway 190 and Fort Hood's front gate, which is just over 1,000 feet north of U.S. Highway 190. U.S. Highway 190 runs east and west. A railroad track close to U.S. Highway 190 also runs east and west. The record does not indicate whether Hood Road is a dedicated public roadway or a private roadway that is part of Fort Hood.

2

as it did, veered off of the road into the median. Thinking that the person in the dark sedan was going to help the other driver, the witness called the MP but did not stop to help.

A MP officer responded immediately. Upon arrival, the officer observed a vehicle facing north in the median between the northbound and southbound lanes of Hood Road. As he approached, he noticed "brain matter" and blood scattered on the front seat. Paramedics arrived shortly thereafter, administered first aid to a female victim later identified as Sharie Durr,[2] and transported her to Darnell Community Hospital at Fort Hood. CID agents then arrived to investigate.

Durr died on the scene. During her autopsy, the medical examiner found a bullet fragment in her head. The examiner determined that the bullet was consistent with a .38 caliber firearm, likely traveled through glass before striking Durr, and was the cause of her death.

_____

[2]According to the record, Sharie Durr was married to a military officer stationed at Fort Hood. But the record does not indicate whether she was a military officer or worked at Fort Hood.

CID's investigation quickly turned to Reff. Cell phone records showed calls from Reff to Durr at 10:24 p.m. and 10:25 p.m., and a call from Durr to Reff at 10:25 p.m., minutes before the fatal incident occurred. A search of Reff's vehicle, which matched the eyewitness's description of the vehicle parked in the median of Hood Road, turned up gunshot residue and cartridge bullet casings. Additionally, agents found gunshot residue on Reff's person.

CID later interviewed Reff about his relationship with Durr. Reff admitted that he knew Durr and stated that he last saw her at a 7-11 store close to Fort Hood at 10:30 p.m. on December 31, the night of the murder. Subsequent investigation revealed that Reff purchased a .38 caliber revolver on December 31.

In a later interview, Reff claimed that he fired the gun on January 1 and then put it in the back seat of his vehicle. But when an agent began to take Reff to his vehicle to retrieve the gun, Reff told him that he lost the gun or the gun perhaps was stolen. Reff later changed his story, stating that he gave the gun to an anonymous

4

friend.

Reff's friends and acquaintances eventually provided agents with strong evidence that Reff was involved in Durr's death. One female friend established that Reff likely had an affair with Durr, who was married to a military officer stationed at Fort Hood. The week before the killing, Reff asked her whether she knew anything about Durr "messing with" another guy. Another female friend reported that Reff was mad at Durr for "seeing other guys."

One of Reff's male acquaintances told agents that Reff asked him to get rid of a gun for him, and that Reff, referring to Durr, stated that he "shot the bitch." Another male acquaintance told agents that Reff said he shot Durr in the head and then hid the gun.

Finally, after his arrest and imprisonment but before his trial, Reff gave to a fellow inmate a somewhat detailed explanation of how he killed Durr. In the end, there was overwhelming evidence presented at trial that Reff killed Durr; and he does not challenge that finding on appeal. Rather, Reff solely focuses on whether the

murder occurred within federal jurisdiction.

## PROCEDURAL HISTORY

Reff was arrested in January 2004. In March 2004, a grand jury superseding indictment charged Reff for "First Degree Murder on a Government Reservation." Specifically, the indictment charged that Reff, on December 31, 2003, murdered Durr "on Fort Hood Military Reservation, a place within the special maritime and territorial jurisdiction of the United States . . . in violation of Title 18, United States Code, Sections 7(3) and 1111(a) and (b)."

During a two-day trial, the Government presented extensive evidence that Reff killed Durr. Reff took the stand and denied killing Durr, but the jury unanimously convicted Reff as charged, and the district court sentenced Reff to life in prison.

The jurisdictional component of the federal statute was not a disputed issue at any time prior to appeal.

## DISCUSSION

On appeal, Reff makes two arguments relating to the jurisdictional element of the statute he was convicted under. First, he argues that the Government provided

6

insufficient evidence for the jury to find that he committed the crime "[w]ithin the special maritime and territorial jurisdiction of the United States." *See* 18 U.S.C. § 1111(b). Second, Reff contends that the district court reversibly erred because it did not define for the jury the phrase "special maritime and territorial jurisdiction of the United States." *Id.*

I. The Sufficiency of the Jurisdictional Evidence

   *A. Standard of Review and Burden of Proof*

   Reff, citing *United States v. Reveles*, urges us to "determine whether a reasonable trier of fact could have found that the evidence established [the jurisdictional element] of the crime beyond a reasonable doubt." 190 F.3d 678, 686 (5th Cir. 1999). The Government disagrees for two reasons.

   First, the Government contends that because at trial Reff did not contest jurisdiction or move for a judgment of acquittal on that or any other basis, our review should be extremely limited. Specifically, we should set aside the conviction only if its affirmance would result in a "miscarriage of justice," *United States v. Partida*,

7

385 F.3d 546, 561 (5th Cir. 2004); that is, only if "the record is devoid of evidence" establishing jurisdiction, *see id.* Reff did not move for a judgment of acquittal on any basis. Therefore, we agree with the Government that our more limited "miscarriage of justice" or "devoid of evidence" standard of review applied. *See id.*

The Government also disagrees with Reff that it was required to prove § 1111's jurisdictional element beyond a reasonable doubt. Rather, pointing to this Court's decision in *United States v. Bell*, which has never been directly overruled, the Government argues that the less burdensome preponderance of the evidence standard applies. 993 F.2d 427, 429 (5th Cir. 1993). Reff points out, and the Governments concedes, that on two recent occasions panels of this Court have called into question *Bell*'s preponderance of the evidence holding. *See United States v. Bailey*, 169 F. App'x 815, 821 (5th Cir. 2006); *United States v. Perrien*, 274 F.3d 936, 939 n.1 (5th Cir. 2001).

The panels in *Bailey* and *Perrien* left the issue unresolved, however, because the record in both cases

8

supported conviction beyond a reasonable doubt. *See Bailey*, 169 F. App'x at 821; *see also Perrien*, 274 F.3d at 939. The record before us supports conviction beyond a reasonable doubt. Therefore, like the panels in *Bailey* and *Perrien*, we leave the issue for another day.

*B. Evidence Relating to the Jurisdictional Element*

Reff argues that the evidence at trial was insufficient to establish federal jurisdiction. We disagree.

Section 1111 applies to murders committed "[w]ithin the special maritime and territorial jurisdiction of the United States." § 1111(b). Title 18, U.S.C. § 7(3) specifies that the phrase "special maritime and territorial jurisdiction of the United States" includes:

> [a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

Reff's first contention regarding the sufficiency of the jurisdictional evidence, which he limited to

9

approximately one page in his brief, is that we cannot presume that the area of Fort Hood around the visitors center is within federal jurisdiction.

However, this Court's jurisprudence does permit such a presumption. We numerous times and without qualification have stated that military reservations such as Fort Hood fall within the definition of "special maritime and territorial jurisdiction of the United States" under 18 U.S.C. § 7. *See, e.g.*, *United States v. Colon-Padilla*, 770 F.2d 1328, 1331 (5th Cir. 1985) (explaining that "[s]ection 7's definition extends to military reservations such as Fort Bliss"); *United States v. Benson*, 495 F.2d 475, 481 (5th Cir. 1974) (explaining the same in a case involving Fort Rucker).

In fact, we previously have been confronted with the same argument that Reff makes here -- i.e. not every part of Fort Hood is within the "special maritime and territorial jurisdiction of the United States." *See Bell*, 993 F.2d at 429. In rejecting the argument, we stated that "crimes committed within the confines of federal military reservations [fall] within the special maritime

and territorial jurisdiction of the United States". *Id.*
Not only did we reject the argument, we also deemed it
"devoid of merit." *Id.* Bound by our prior decisions and
once again unpersuaded by this argument, we find that
Fort Hood is within federal jurisdiction under 18 U.S.C.
§ 7(3).

Before moving on to Reff's next argument, we must
briefly point out that the Government at trial
established that the visitors center is within the
boundaries of Fort Hood and thus within federal
jurisdiction.[3] As it always should be, establishing
jurisdiction was the Government's first order of business
at trial. The Government began its case-in-chief by

---

[3]The Government's evidence regarding jurisdiction
generally was conclusory opinion testimony not objected
to Reff. Also, Reff did not offer any contradictory
evidence. As discussed below, the evidence indicates Durr
was shot on the northbound roadway of Hood Road near the
visitors center. If the record showed that the right-of-
way for Hood Road had been dedicated to the public and
that fences along the east and west side of the road
established that right-of-way, the jurisdictional issue
in this case would be more problematic. But given the
uncontradicted evidence offered at trial by the
Government, we conclude that this is not a case where
reversal is required to prevent a miscarriage of justice.

calling to the stand Thomas Webb. Webb is employed by the U.S. Army Corps of Engineers and works at its Central Texas area office on Fort Hood.

Webb indicated that his job requires him to be intimately familiar with Fort Hood's post boundaries. While looking at an aerial photograph of the reservation, Webb pointed to the visitors center and stated that "the boundary is further to the south. So we're about 1,000 feet plus into the boundary of Fort Hood. So that's -- the boundary's is [sic] way down in this direction which is railroad tracks, things like that establish the boundary." Numerous other Government witnesses, including a Fort Hood MP officer and CID agent who both were familiar with the reservation's boundaries, agreed with Webb that the area at issue unquestionably is within Fort Hood's southern boundary. As we noted above, Reff offered no evidence to the contrary. Indeed, regarding jurisdiction, Reff did not cross-examine a single Government witnesses.

We now turn to Reff's argument that even if Fort Hood is within federal jurisdiction and the visitors center is

12

on Fort Hood, the Government failed to prove that the murder was committed near the visitors center. Reff correctly notes that the proper inquiry is where the fatal injury was inflicted, not where the death occurred. *See* 18 U.S.C. § 3236.

The thrust of Reff's argument is that the Government proved that Durr died near the visitors center, but failed to prove that Reff inflicted her injury there.

Reff explains what he sees as a possible alternative scenario: Durr's car was found facing north in the median of Hood Road near the visitors center. Thus, she likely was traveling north before she crashed. The visitors center is only approximately 1,000 north of U.S. Highway 190, presumably where Durr entered the reservation before she was shot. U.S. Highway 190 is not part of Fort Hood.

Reff further explains that because Durr could have traveled 1,000 feet in her vehicle in a short period of time, she could have been shot in the head somewhere off of the reservation, such as on U.S. Highway 190. Then, she could have entered Fort Hood seeking medical attention before she died. (The location where Durr's car

13

crashed was on the way to the hospital.)

Regardless of whether on appeal Reff has come up with a plausible alternative scenario, this Court's review is for a "miscarriage of justice." The record certainly is not "devoid of evidence" regarding where Reff shot Durr; some evidence, if not substantial evidence or all of the evidence, suggests that he shot her in the head near or at the visitors center on Fort Hood, within federal jurisdiction.

## II. The Jury Instruction

Reff next contends that the district court reversibly erred by not giving the jury a more specific instruction regarding the phrase "special maritime and territorial jurisdiction of the United States." The parties agree that because Reff did not object to the jury instruction or submit his own, our review is for plain error. *See United States v. McClatchy*, 249 F.3d 348, 357 (5th Cir. 2001).

Reff first points to *United States v. Winship* for the proposition that it is plain error for a district court to not instruct on an essential element of a crime. 724

14

F.2d 1116, 1124 (5th Cir. 1984). However, the district court did give an instruction. The court told the jury that it had to be convinced that the Government had proven beyond a reasonable doubt "[t]hat the killing took place within the special maritime and territorial jurisdiction of the United States." Reff, therefore, must show that the instruction was somehow inadequate. However, he has provided no explanation regarding what the court should have said, how further instruction would have aided the jury, or how his substantial rights were affected by the alleged omission.

Next, Reff relies on a Ninth Circuit decision, *United States v. Warren*, 984 F.2d 325 (9th Cir. 1993), which he claims strongly supports his position. The court in *Warren* stated that "[t]he failure to instruct on every single element . . . is harmless only if the omitted element is undisputed." *Id.* at 328. Again, here the court did give an instruction. Additionally, *Warren* does not help Reff because it implicitly stands for the proposition that a failure to instruct on an element is harmless when the element is undisputed. *See id.* As we

mentioned, the jurisdictional element went undisputed at trial. This alone convinces us that the district court's decision to not give a more detailed instruction was not reversible error.

We are further comforted by the fact that the court used a Fifth Circuit Pattern Jury Instruction ("No. 2.55, Murder (First Degree)"). We previously have stated that the use of an unobjected-to pattern jury instruction rarely will rise to the level of plain error. *See United States v. Stewart*, 879 F.2d 1268, 1271 (5th Cir. 1989). This is not one of those rare occasions.

In sum, sufficient evidence supports Reff's conviction, and the district court's jury instruction did not constitute plain error.

## CONCLUSION

For the foregoing reasons, we AFFIRM Reff's conviction.

**AFFIRMED.**